Max D. Garner, ABA #9011096
David Karl Gross, ABA #9611065
Adam W. Cook, ABA #0611071
Birch Horton Bittner & Cherot
1127 West Seventh Avenue
Anchorage, AK 99501
Telephone: 907.276.1550
Facsimile: 907.276.3680
mgarner@bhb.com
dgross@bhb.com
acook@bhb.com

Attorneys for Defendant INTEGRATED CONCEPTS AND RESEARCH
CORPORATION, a corporation

Lisa M. Marchese, ABA #1102004
Dorsey Whitney
1031 West Fourth Avenue
Suite 600
Anchorage, AK 99501-5907
Telephone: 907-276-4557
Facsimile: 907-276-4152
marchese.lisa@dorsey.com

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| MUNICIPALITY OF ANCHORAGE, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 3:13-cv-_____ |
| | ) | |
| vs. | ) | |
| | ) | |
| INTEGRATED CONCEPTS AND | ) | Superior Court Case |
| RESEARCH CORPORATION, a | ) | No. 3AN-13-5699 CI |
| corporation; PND ENGINEERS, Inc., a | ) | |
| corporation; and CH2M HILL ALASKA, | ) | |
| Inc. a corporation, | ) | |
| | ) | |
| Defendants. | ) | |

## JOINT NOTICE OF REMOVAL

Defendants Integrated Concepts and Research Corporation ("ICRC"), and

PND Engineers, Inc. ("PND"), hereby remove this case from the Superior Court for

BIRCH HORTON BITTNER & CHEROT
ATTORNEYS AT LAW
1127 WEST SEVENTH AVENUE
ANCHORAGE, ALASKA 99501-3301
TELEPHONE (907) 276-1550 • FACSIMILE (907) 276-3680

MOA V. ICRC, PND AND CH2M HILL                           CASE NO. 3:13-CV-_____
JOINT NOTICE OF REMOVAL                                                    PAGE 1 OF 25
F:\506347\1\00309291.DOCX

Case 3:13-cv-00063-SLG   Document 2   Filed 04/10/13   Page 1 of 25

the State of Alaska, Third Judicial District at Anchorage to the United States District Court for the District of Alaska, pursuant to 28 U.S.C. § 1442 (federal officer removal) and §§ 1331, 1441 (federal question removal). In addition, counsel for Defendant CH2M Hill Alaska, Inc. ("CH2M Hill"), has authorized counsel for ICRC to represent to this Court that Defendant CH2M Hill consents to removal of this action as well.[1]

## I.    PURSUANT TO 28 U.S.C. § 1446, REMOVAL IS TIMELY

On March 8, 2013, a civil action was commenced against Defendants with the filing of Plaintiff's Complaint captioned *Anchorage, a Municipal Corp. v. Integrated Concepts & Research Corp., et al.*, No. 3AN-13-5699 CI (Superior Court, Anchorage, Alaska—Third Judicial District). ICRC was served with Summons and Complaint on March 12, 2013. PND was served with Summons and Complaint on March 14, 2013. CH2M Hill was served with the Summons and Complaint on March 11, 2013. A true and correct copy of Plaintiff's Complaint is attached hereto as Exhibit 1, as required by 28 U.S.C. § 1446(a). Defendants are filing this Notice of Removal within thirty (30) days of service of Plaintiff's Complaint, making removal on federal officer removal grounds timely. See 28 U.S.C. § 1442(a)(1); 28 U.S.C. § 1446(b).[2]

Additionally, for purposes of federal question removal, the Federal Courts Jurisdiction and Venue Clarification Act of 2011, Pub. L. No. 112-63, provides that "[e]ach defendant shall have 30 days after receipt by or service on that defendant of

BIRCH HORTON BITTNER & CHEROT
ATTORNEYS AT LAW
1127 WEST SEVENTH AVENUE
ANCHORAGE, ALASKA 99501-3301
TELEPHONE (907) 276-1550 • FACSIMILE (907) 276-3680

---

[1] Defendants expressly reserve all defenses to Plaintiff's claims, including all challenges to subject matter jurisdiction. In responding to the allegations in the Complaint, Defendants do not concede in any way their completeness or accuracy or that Plaintiff has adequately pled a legally cognizable claim.

[2] Under section 1442, not all defendants need consent to removal. *Thompson v. Crane Co.*, No. 11-00638 LEK-RLP, 2012 WL 1344453 (Apr. 17, 2012 D. Hawai'i) (*citing Elly Valley Mines, Inc. v. Hartford Accident and Indem. Co.*, 644 F.2d 1310, 1315 (9th Cir. 1981)).

MOA V. ICRC, PND AND CH2M HILL                    CASE NO. 3:13-CV-_____
JOINT NOTICE OF REMOVAL                                                    PAGE 2 OF 25
F:\506347\1\00309291.DOCX

Case 3:13-cv-00063-SLG   Document 2   Filed 04/10/13   Page 2 of 25

the initial pleading or summons . . . to file the notice of removal." <u>See</u> 28 U.S.C. § 1446(b)(2)(B). Defendants join in and/or consent to this removal, and thus this Notice of Removal is timely and satisfies the unanimity requirement for federal question removal.

## II.    **BACKGROUND**

This suit arises from Defendants' role in the joint federal/state public works project known as the Port of Anchorage Intermodal Expansion Project ("the Project"). As envisioned by the U.S. Department of Transportation's Maritime Administration ("MARAD") and the Port of Anchorage ("the Port"), the purpose of the multi-year project was to replace aging port structures, increase port capacity in order to accommodate growing demand, and to accommodate the U.S. military's needs for rapid deployment. <u>See</u> Complaint at ¶ 11. The Project included expansion of commercial dock space, barge terminal development, road and rail access development, and other substantial efforts designed not only to improve and increase commercial operations but also to establish a strategic platform and port of embarkation for the immediate deployment of U.S. military forces. <u>See</u> Declaration of Diana J. Carlson (hereinafter "Carlson Decl."), attached hereto as Exhibit 2, at ¶ 4. The Project was funded using both federal and local funds, with MARAD providing overall federal project oversight and contract administration throughout the duration of the project. <u>See</u> Memorandum of Understanding by and Between the Municipality of Anchorage and its department, Port of Anchorage and Maritime Administration (June 26, 2003), (attached as Attachment I to the accompanying declaration of Diana Carlson). In addition, the Port agreed to "provide all program requirements" and

BIRCH HORTON BITTNER & CHEROT
ATTORNEYS AT LAW
1127 WEST SEVENTH AVENUE
ANCHORAGE, ALASKA 99501-3301
TELEPHONE (907) 276-1550 • FACSIMILE (907) 276-3680

MOA V. ICRC, PND AND CH2M HILL                         CASE NO. 3:13-CV-_____
JOINT NOTICE OF REMOVAL                                                    PAGE 3 OF 25
F:\506347\1\00309291.DOCX

Case 3:13-cv-00063-SLG   Document 2   Filed 04/10/13   Page 3 of 25

"review all plans, specifications, and status reports submitted by the primary contractor and its subcontractors" before submission to MARAD for its final review and approval.  See *Id*.

Because of the significant and overarching federal interest in the Project, close coordination with various federal entities was required, particularly with the United States military.  Indeed, much of the Project work required access to and use of military land that had been leased or licensed to the Port.  See e.g., Resolutions from the Municipality of Anchorage Approving Leases with the Army and Air Force (attached as Attachments C and D to the accompanying declaration of Diana Carlson).  See also Carlson Decl. at ¶ 10.  Further, the United States Army's Surface Deployment and Distribution Command has designated Anchorage as a Strategic Seaport because of its value as a deployment center for military operations in times of crisis.  See Carlson Decl. at ¶ 8; Memorandum for Commander, Surface Deployment and Distribution Command re: Port of Anchorage Strategic Seaport Designation (attached as Attachment A to the accompanying declaration of Diana Carlson).  In addition, an essential purpose of the Project is to ensure that the Port can accommodate the growing presence in the region of the U.S. Army's Alaska Command.  See Carlson Decl. at ¶ 9.  The Port is also intended for use by three Army Stryker Brigade Combat Teams as a rapid deployment platform, and the Project specifically created new land to provide an additional staging area for military deployments. *Id*.

In addition to coordinating with the Department of Defense in identifying program requirements, MARAD and the Port also had to coordinate with several

MOA V. ICRC, PND AND CH2M HILL                    CASE NO. 3:13-CV-_____
JOINT NOTICE OF REMOVAL                                                    PAGE 4 OF 25
F:\506347\1\00309291.DOCX

Case 3:13-cv-00063-SLG   Document 2   Filed 04/10/13   Page 4 of 25

other federal agencies in their roles as contract administrator and project owner.  For example, MARAD and the Port had to obtain permits from the U.S. Army Corps of Engineers ("USACE") pursuant to the Rivers and Harbors Act of 1899 and the Clean Water Act.  See, e.g., Permit No. POA-2003-502-N (attached as Attachment R to the accompanying declaration of Diana Carlson).  MARAD and the Port also had to coordinate closely with USACE during the construction phase of the Project to prevent any interference with dredging work that USACE was performing in the Port at the same time as the Project work.  See Carlson Decl. at ¶ 32.  MARAD and the Port were also subject to regulation by the National Oceanic and Atmospheric Administration's National Marine Fisheries Service.  Id. at ¶ 7.

During the course of Project performance, MARAD and Plaintiff formed the Project Oversight and Management Organization (POMO) in order to "provide overall executive leadership, vision, policy, strategic objectives, and priorities for the Project." See Carlson Decl. at ¶ 20; Memorandum of Agreement by and Between the Municipality of Anchorage and its Department, Port of Anchorage and the U.S. Department of Transportation, Maritime Administration (Nov. 7, 2011) [hereinafter 2011 MOU] (attached as Attachment L to the accompanying declaration of Diana Carlson).  The POMO was comprised of representatives from MARAD, the Port, and the Municipality of Anchorage.  See Id.  Contractors and subcontractors, including the Defendants, were not members of the POMO and could not participate in POMO meetings unless invited.  Id.  Although the POMO was formed late in the project, the POMO formalized the course of conduct the parties had established throughout project performance:  MARAD and the Port determined project requirements, budget,

MOA V. ICRC, PND AND CH2M HILL                    CASE NO. 3:13-CV-_____
JOINT NOTICE OF REMOVAL                                                  PAGE 5 OF 25
F:\506347\1\00309291.DOCX

and goals, and then instructed the contractors and subcontractors, including the Defendants, to carry out these requirements subject ultimately to MARAD's review and approval. See Carlson Decl. at ¶ 20.[3]

In 2003, MARAD contracted with Defendant ICRC to assist with technical management and staff augmentation support services. See Carlson Decl. at ¶ 11; Contract DTMA1D03009 [hereinafter 2003 Contract], (the relevant portions thereof are attached as Attachment E to the accompanying declaration of Diana Carlson). In 2008 Defendant ICRC and MARAD signed a second contract with similar terms and objectives. See Carlson Decl. at ¶ 13; Contract DTMA1D08012 [hereinafter 2008 Contract] (the relevant portions thereof are attached as Attachment F to the accompanying declaration of Diana Carlson). Both contracts are governed by federal government contracts law as the contract terms and conditions largely comprise contract clauses from the Federal Acquisition Regulations ("FAR").

During contract performance, MARAD subjected ICRC to close review and oversight. In fact, during contract performance, MARAD stationed an Administrative Contracting Officer and later a Contracting Officer's Technical Representative in residence at the same Anchorage building from which ICRC performed its contractual responsibilities. See Carlson Decl. at ¶ 14. Furthermore, MARAD brought engineers and construction experts on site frequently to deal with Project issues. MARAD reviewed and approved specifications for every subcontract ICRC awarded during Project performance and, once approved by MARAD, ICRC could not

BIRCH HORTON BITTNER & CHEROT
ATTORNEYS AT LAW
1127 WEST SEVENTH AVENUE
ANCHORAGE, ALASKA 99501-3301
TELEPHONE (907) 276-1550 • FACSIMILE (907) 276-3680

---

[3] The only significant change to the prior course of conduct was, under the 2011 MOU, the Municipality of Anchorage became more involved in the technical direction

MOA V. ICRC, PND AND CH2M HILL                    CASE NO. 3:13-CV-_____
JOINT NOTICE OF REMOVAL                                              PAGE 6 OF 25
F:\506347\1\00309291.DOCX

Case 3:13-cv-00063-SLG   Document 2   Filed 04/10/13   Page 6 of 25

BIRCH HORTON BITTNER & CHEROT
ATTORNEYS AT LAW
1127 WEST SEVENTH AVENUE
ANCHORAGE, ALASKA 99501-3301
TELEPHONE (907) 276-1550 • FACSIMILE (907) 276-3680

unilaterally change the specifications. <u>See</u> Carlson Decl. at ¶ 25. For example, changes proposed through the Contracts' Value Engineering Change Proposal Clauses specifically provide that acceptance or rejection of a Change Proposal is "a unilateral decision made solely at the discretion of the [MARAD] Contracting Officer" and that until such a decision is made "the Contractor shall perform in accordance with the existing contract." <u>See</u> 2003 Contract, at § I-1; 2008 Contract, at 5.

As part of its contractual duties—and only after receiving review, approval, and direction from MARAD and the Port regarding subcontractor selection and scope of work—ICRC contracted with Defendants PND Engineers, Inc. ("PND") and CH2M Hill Alaska (formerly known as VECO Alaska, Inc.) for technical support and engineering services required for the Project. MARAD ultimately oversaw and approved work PND and CH2M Hill performed on the Project, and their contracts also incorporated numerous FAR clauses and contractual requirements, thus subjecting them to federal government contracts law.

Plaintiff, the Municipality of Anchorage, alleges that the Defendants negligently performed their contractual obligations related to the Project. Plaintiff asserts several causes of action in support of these allegations: breach of contract, professional negligence, and negligence. <u>See</u> Complaint, Counts I-VI. Specifically, the allegations in the lawsuit call into question a number of contractual activities, including, primarily: the selection of the "Open Cell Sheet Pile" ("OCSP") technology for use in the Project; the adequacy of the project design put forward by Defendant PND; the selection of PND to direct and supervise the actual installation of the OCSP

and decision-making process that had previously been a joint effort between MARAD

MOA V. ICRC, PND AND CH2M HILL                          CASE NO. 3:13-CV-_____
JOINT NOTICE OF REMOVAL                                           PAGE 7 OF 25
F:\506347\1\00309291.DOCX

design; the selection and use of subcontractor QAP to perform construction work; the use and placement of "armor rock" in the Project and failure to account for its displacement as the Project moved forwards; the decision not to "pre-dredge" prior to the placement of rock fill; the approval of QAP's dike plan; and the decision not to conduct inspection dredging until the fall of 2010.

As demonstrated below, removal of the Complaint to this Court is appropriate for several reasons.

III. **PURSUANT TO 28 U.S.C. § 1442, REMOVAL IS PROPER BECAUSE THE ACTION IS BROUGHT AGAINST ENTITIES ACTING UNDER THE DIRECTION OF A FEDERAL OFFICER**

This case can be removed pursuant to 28 U.S.C. § 1442 because it involves an action against a person acting under an officer of the United States. 28 U.S.C. § 1442(a)(1); *see* Mesa v. California, 489 U.S. 121, 124-25 (1989); Durham v. Lockheed Martin Corp., 445 F.3d 1247, 1251 (9th Cir. 2006); Winters v. Diamond Shamrock Chem. Co., 149 F.3d 387, 396-97 (5th Cir. 1998); Venezia v. Robinson, 16 F.3d 209, 211-12 (7th Cir. 1994); Magnin v. Teledyne Cont'l Motors, 91 F.3d 1424, 1427 (11th Cir. 1996).

To establish removal jurisdiction under section 1442(a)(1), a defendant must: (1) demonstrate that it is a "person" within the meaning of the statute; (2) establish that it acted pursuant to a federal officer's directions and that a causal nexus exists between the defendant's actions under color of federal office and the plaintiff's claims; and (3) assert a colorable federal defense to state-law liability. See Mesa, 489 U.S. at 129; Durham, 445 F.3d at 1251; Winters, 149 F.3d at 398, 400.

and the Port. See Carlson Decl. ¶ 20.

MOA V. ICRC, PND AND CH2M HILL                                    CASE NO. 3:13-CV-_____
JOINT NOTICE OF REMOVAL                                           PAGE 8 OF 25
F:\506347\1\00309291.DOCX

Case 3:13-cv-00063-SLG   Document 2   Filed 04/10/13   Page 8 of 25

BIRCH HORTON BITTNER & CHEROT
ATTORNEYS AT LAW
1127 WEST SEVENTH AVENUE
ANCHORAGE, ALASKA 99501-3301
TELEPHONE (907) 276-1550 • FACSIMILE (907) 276-3680

It is well established that removals under the federal officer removal statute are construed broadly. Although federal courts usually construe removal jurisdiction narrowly, the Supreme Court has held that the federal officer removal statute is an exception to this rule. In Willingham v. Morgan, the Supreme Court emphasized that the federal officer removal statute is neither "narrow" nor "limited," and the policy underlying the statute "should not be frustrated by a narrow, grudging interpretation." 395 U.S. 402, 406-07 (1969); accord Durham, 445 F.3d at 1252 (holding that "the Supreme Court has mandated a generous interpretation of the federal officer removal statute"). Similarly, in order to establish a colorable federal defense, Defendants need not show that they can prevail on all of their federal defenses, but simply need to demonstrate that at least one of their federal defenses is plausible. See Mesa, 489 U.S. at 129; Willingham, 395 U.S. at 409. As demonstrated below, Defendants satisfy each of these elements in this case.

### A. Defendants Are A Legal Person Under the Statute

Defendants are a legal "person" for the purposes of removal under 28 U.S.C. § 1442. See Winters, 149 F.3d at 398 ("corporate entities qualify as 'persons' under § 1442(a)(1)"); Fung v. Abex Corp., 816 F. Supp. 569, 572 (N.D. Cal. 1992). See also Watson v. Philip Morris Cos., 551 U.S. 142, 152-53 (2007) (interchangeably referring to a "private person" and a "company" when discussing applicability of the federal officer removal statute).

### B. A "Causal Nexus" Exists Between Defendants' Activities Under Color of Federal Office and Plaintiff's Claims

Defendants satisfy the second prong of the federal officer removal test by demonstrating that their actions at issue were undertaken pursuant to a federal

MOA V. ICRC, PND AND CH2M HILL                    CASE NO. 3:13-CV-_____
JOINT NOTICE OF REMOVAL                                          PAGE 9 OF 25
F:\506347\1\00309291.DOCX

Case 3:13-cv-00063-SLG    Document 2    Filed 04/10/13    Page 9 of 25

BIRCH HORTON BITTNER & CHEROT
ATTORNEYS AT LAW
1127 WEST SEVENTH AVENUE
ANCHORAGE, ALASKA 99501-3301
TELEPHONE (907) 276-1550 • FACSIMILE (907) 276-3680

officer's directions and a causal nexus exists between those actions and Plaintiff's claims. Durham, 445 F.3d at 1251; Winters, 149 F.3d at 398-99. See also Jefferson Cnty. v. Acker, 527 U.S. 423, 432 (1999) ("demanding an airtight case . . . in order to show the required causal connection. . . . would defeat the purpose of the removal statute"); Reaser v. Allis Chambers Corp., No. 08-1296, 2008 WL 8911521, at *5 (C.D. Cal. June 23, 2008) (finding causal nexus prong met for purposes of removal when declarations showed that Navy had direct control over all aspects of contract performance and it could, therefore, be inferred that Defendants' alleged negligence resulted from Navy direction).

### 1.  *Defendants "Acted Under" A Federal Officer*

At all relevant times, Defendants were acting under the detailed authority and control of federal officers – i.e., the Administrators of the U.S. Maritime Administration or their delegees, including the cognizant Contracting Officers. Watson, 551 U.S. at 147 ( "[t]he words 'acting under' are broad," and "the [federal officer removal] statute must be liberally construed"); accord Jacks v. Meridian Res. Co., LLC, 701 F.3d 1224 (8th Cir. 2012); see also Isaacson v. Dow Chem. Co., 517 F.3d 129, 137 (2d Cir. 2008) ("The hurdle erected by this requirement is quite low."). The attached declaration from Diana Carlson establishes that Defendants discharged their contractual duties pursuant to the directions of various federal officers. See Carlson Decl. at ¶ 7. Ms. Carlson served as Project Principal and team leader for ICRC during Project performance, and therefore has direct knowledge of Defendants' activities performed under the contracts at issue. See Id. at ¶ 4. In her declaration, Ms. Carlson explains that "[o]ver the course of the past decade, MARAD has closely monitored, controlled, and approved every facet of the Project effort." Id. at ¶ 5.

BIRCH HORTON BITTNER & CHEROT
ATTORNEYS AT LAW
1127 WEST SEVENTH AVENUE
ANCHORAGE, ALASKA 99501-3301
TELEPHONE (907) 276-1550 • FACSIMILE (907) 276-3680

Specifically, Ms. Carlson explains that MARAD's "high level of control and supervision" extended:

> over every aspect of ICRC's role in the Project, including the initial evaluation and selection of technology for the Project; subsequent design work; preparation of subcontractor bid packages; selection of subcontractors; review of construction planning and execution; and overall project management alleged to be deficient or defective . . .

*Id*. at ¶ 7. Ms. Carlson further notes that:

> [t]his control and supervision was exercised not only by MARAD, the federal entity that contracted with and supervised ICRC, but also by the U.S. Army Corps of Engineers ("USACE"). . . . the National Oceanic and Atmospheric Administration's National Marine Fisheries Service. . . . [and] other federal agencies with regulatory and oversight responsibilities over the Project . . .

> *Id*.

Indeed, Plaintiff's Complaint itself acknowledges, on numerous occasions, albeit obliquely and somewhat begrudgingly, the authority and control that MARAD exercised over the Defendants and their work related to the Project. <u>See</u>, *e.g.*, Complaint at ¶ 15 (Plaintiff *relied upon* MARAD to contract with, and *oversee*, ICRC's administration of the overall Project); at ¶ 45 (acknowledging "MARAD's *approval* to engage PND for the oversight role"); at ¶ 75 (design approaches were *evaluated* by MARAD); at ¶ 83 (MARAD "*push[ed]* the use of the [open cell sheet pile] system toward final design and construction"); at ¶ 165 (reflecting MARAD's review and approval of contract change orders); at ¶ 182 (noting MARAD's efforts with ICRC and PND to create a "constructible design") (emphasis added in all). The Complaint contains other references that effectively establish that the Defendants were working at the direction of, and subject to the approval by, MARAD. <u>See</u>, *e.g.*, at ¶ 20 (ICRC required to make "recommendations" to MARAD for selection of subcontractors); at ¶

MOA V. ICRC, PND AND CH2M HILL       CASE NO. 3:13-CV-_____
JOINT NOTICE OF REMOVAL       PAGE 11 OF 25
F:\506347\1\00309291.DOCX

Case 3:13-cv-00063-SLG    Document 2    Filed 04/10/13    Page 11 of 25

BIRCH HORTON BITTNER & CHEROT
ATTORNEYS AT LAW
1127 WEST SEVENTH AVENUE
ANCHORAGE, ALASKA 99501-3301
TELEPHONE (907) 276-1550 • FACSIMILE (907) 276-3680

28 (ICRC "recommended" to MARAD selection of Defendant PND as a subcontractor; at ¶ 77 (ICRC "recommended" design for use on the Project to MARAD).

Ms. Carlson's affidavit also establishes that not only did ICRC communicate regularly with MARAD though electronic mail, written memoranda, and other correspondence so that ICRC could keep MARAD apprised of Project developments and MARAD could in turn give ICRC direction, but also, throughout Project performance:

> a MARAD representative was physically located in ICRC's Anchorage office to supervise, review, and approve ICRC's execution of its contract responsibilities as well as other Project work. Initially, the on-site representative was MARAD's Administrative Contracting Officer ("ACO"). Later, the Contracting Officer's Technical Representative ("COTR") replaced the ACO as MARAD's on-site representative.

See Carlson Decl. at ¶ 14. Such constant communication was necessary, in part, because ICRC could not make any unilateral contract changes and had to seek and receive MARAD approval throughout the Project as circumstances changed. *Id.* at ¶ 25.

As both Plaintiff's Complaint and the materials attached hereto make clear, therefore, Defendants "acted under" the direction of federal officers for purposes of federal officer removal.

### 2. *A Causal Nexus Exists Between Defendants' Actions Under a Federal Officer and Plaintiff's Claims*

A causal nexus exists between Defendants' actions taken under federal authority and Plaintiff's claims. Plaintiff alleges that Defendants negligently discharged their contractual duties in a variety of ways, including design recommendation, subcontractor selection, and various construction techniques. As

MOA V. ICRC, PND AND CH2M HILL                    CASE NO. 3:13-CV-_____
JOINT NOTICE OF REMOVAL                                          PAGE 12 OF 25
F:\506347\1\00309291.DOCX

Case 3:13-cv-00063-SLG   Document 2   Filed 04/10/13   Page 12 of 25

established above, however, and as set forth in more detail in the accompanying declaration by Diana Carlson, those very acts were directed and controlled by MARAD and other federal entities.

For example, Ms. Carlson states that the Port and MARAD were the ultimate decision-makers regarding the choice to use the OCSP design and "[o]nce MARAD approved the use of the OCSP design . . . ICRC had no discretion to make any changes to the specifications or features without first obtaining MARAD's written approval." See Carlson Decl. at ¶ 22. In fact, when preparing the solicitation for the contract ultimately awarded to PND for the OCSP design, MARAD's Contracting Officer, Mr. Wayne Leong, specifically instructed ICRC to write "[t]he OCSP was determined to be the preferred method of construction." See Addendum 3 to Request for Proposal No. 4312-2-S29 (attached as Attachment N to the accompanying declaration of Diana Carlson). Not only did MARAD and the Port decide that OCSP was the preferred method of construction, and then direct ICRC to include that language in the solicitation, but MARAD also oversaw the selection of co-defendant PND. See Carlson Decl. at ¶¶ 21-24.

Similarly, Plaintiff's complaint explicitly challenges the use of armor rock as one that "would have disastrous consequences for the Project . . . ." Complaint at ¶ 102. However, MARAD reviewed, approved, and directed the use of armor rock in the Project instead of other options. See Carlson Decl. ¶¶ 27-28. Such approval only came after MARAD's comparison of the advantages of this method of tidal protection with other potential options and its conclusion that the use of armor rock was the best option.

BIRCH HORTON BITTNER & CHEROT
ATTORNEYS AT LAW
1127 WEST SEVENTH AVENUE
ANCHORAGE, ALASKA 99501-3301
TELEPHONE (907) 276-1550 • FACSIMILE (907) 276-3680

MOA V. ICRC, PND AND CH2M HILL   CASE NO. 3:13-CV-_____
JOINT NOTICE OF REMOVAL       PAGE 13 OF 25
F:\506347\1\00309291.DOCX

Case 3:13-cv-00063-SLG  Document 2  Filed 04/10/13  Page 13 of 25

Based on the foregoing as well as the further evidence provided in Ms. Carlson's declaration, Defendants have established the requisite causal nexus.  See Blackman v. Asbestos Defs. (BHC), No. C-97-3066, 1997 WL 703773, at *3 (N.D. Cal. Nov. 3, 1997) (requirement of a "causal nexus" satisfied by proof that a contractor is "acting under" a federal officer).

### C.    Defendants Assert Colorable Federal Defenses

Defendants also satisfy the third element of the federal officer removal test by asserting colorable federal defenses, including the government contractor defense and derivative sovereign immunity.  At this stage in the proceedings, Defendants need not show that either of these defenses will prevail, but only that one of the defenses is plausible.  See Mesa, 489 U.S. at 129; Willingham, 395 U.S. at 409 (holding that a defendant need only "put in issue the questions" in order to allow "the validity of [his] defenses [to] be determined in the federal courts"); see also Durham, 445 F.3d at 1252; Venezia, 16 F.3d at 212 ("[a] federal defendant need not show that he is entitled to prevail in order to have access to the federal forum"); Magnin, 91 F.3d at 1427 (the stated federal defense "need only be plausible; its ultimate validity is not to be determined at the time of removal"); Culver v. Asbestos Defendants (BP), No. 10-03484, 2010 WL 5094698, at *6 (N.D. Cal. Dec. 8, 2010) ("Pursuant to the Durham policy favoring removal for federal officers, a defendant does not need to show a valid or likely successful federal defense, but merely a colorable one.")

**The Government Contractor Defense.**  The government contractor defense is a colorable federal defense implicated by Plaintiff's Complaint.   Under the government contractor defense, liability for services performed under a federal government contract cannot be imposed, pursuant to state law, when (1) the United

BIRCH HORTON BITTNER & CHEROT
ATTORNEYS AT LAW
1127 WEST SEVENTH AVENUE
ANCHORAGE, ALASKA  99501-3301
TELEPHONE (907) 276-1550 • FACSIMILE (907) 276-3680

States approved reasonably precise specifications; (2) the contractor's performance conformed to those specifications; and (3) the contractor warned the United States about the dangers that were known to the contractor but not to the United States. Boyle v. United Techs. Corp., 487 U.S. 500, 512 (1988); Getz v. Boeing Co., 654 F.3d 852, 861 (9th Cir. 2011).

The attached declaration and documents demonstrate that the government contractor defense is more than a colorable federal defense to Plaintiff's claims. As to the first element, MARAD meaningfully reviewed and approved all aspects of Project performance as evidenced in email and memoranda exchanged between the parties demonstrating multiple rounds of MARAD questions, comments, and directives regarding various Project requirements. For example, Ms. Carlson explains that:

> Prior to the issuance of a task order, the base contract required ICRC to submit a written specification with cost and time estimates for the required work. As required by the contract, MARAD reviewed the specifications and cost estimates, modified them as it thought necessary, and approved them before issuing a task order to ICRC.

See Carlson Decl. at ¶ 12. MARAD and ICRC used a similar process for developing subcontractor requirements. In her affidavit, Ms. Carlson explains that:

> The Port would advise ICRC what it required for the project. ICRC then would draft a set of specifications and a draft solicitation that, following review and approval by the Port, would be provided to MARAD. MARAD personnel would review the specifications and solicitation extensively. As part of this process, MARAD personnel would decide what project delivery method the project should use, such as whether the project should be a design-build project or a design-bid-build project. MARAD personnel would also determine what solicitation type should be used, such as whether the solicitation should be a values-based "Request for Proposal" or whether the solicitation should be a low-bid "Invitation to Bid."

MOA V. ICRC, PND AND CH2M HILL
JOINT NOTICE OF REMOVAL
F:\506347\1\00309291.DOCX
CASE NO. 3:13-CV-_____
PAGE 15 OF 25

Case 3:13-cv-00063-SLG   Document 2   Filed 04/10/13   Page 15 of 25

Frequently, months were required for MARAD and the Port to review, discuss, modify, and approve every aspect of the draft solicitation.

See Carlson Decl. at ¶ 25. This "back and forth" process frequently involved numerous email exchanges between ICRC and MARAD as well as multiple rounds of red-lined documents. See, *e.g.*, Email Exchange Between MARAD Contracting Officer and Diana Carlson regarding Evaluation Criteria (attached as Attachment O to the accompanying declaration of Diana Carlson); Red-lined Version of RFP No. 4312-2-S29 (attached as Attachment P to the accompanying declaration of Diana Carlson). See Kerstetter v. Pac. Scientific Co., 210 F.3d 431, 435 (5th Cir. 2000) (continuous "back and forth" between government and contractor tends to establish first prong of government contractor defense).

As to the second prong of the government contractor defense, MARAD accepted Project work as conforming to the detailed specifications through email and memoranda expressly granting approval and by issuing certificates of substantial and final completion to Project subcontractors. See Carlson Decl. at ¶¶ 18, 25, 28. For example, at the conclusion of AIC's 2006 subcontract, the MARAD Contracting Officer signed a Certificate of Final Completion and "attest[ed] that the work described" in the certificate "has been inspected and rendered per the terms of the contract, specifications, and all other applicable requirements, including customary industry standards and as free from material defects." See Certificate and Acceptance and Completion for Task Order 405 (attached as Attachment J to the accompanying declaration of Diana Carlson).

According to documentation attached to the Certificate of Final Completion, Task Order 405 was part of the North Backlands Project, which "consisted of placing

fill material over a 27-acre footprint located immediately north of the existing Port facilities" in order to provide "21.5 usable acres of land." AIC's work on this project included work on the Shot-Rock Dike. As Ms. Carlson establishes in her accompanying declaration, by signing the close-out paperwork, the Contracting Officer indicated, on behalf of MARAD that it accepted all work performed under the task order as conforming to contract requirements. <u>See</u> Carlson Decl. at ¶ 30.

In addition, MARAD accepted work as conforming to project specifications every time it closed out contract task orders. <u>See</u> Carlson Decl. at ¶ 19. For example, on January 31, 2009, MARAD closed out Task Order 414 and indicated on a form signed by the Contracting Officer that "[a]ll deliverables for Task Order 414 required by the transition date have been submitted and accepted by MARAD." <u>See</u> Amendment/Modification No. 0004 to Task Order 414 (attached as Attachment K to the accompanying declaration of Diana Carlson). The line item summary included in the task-order close out paperwork indicated that:

> This task order includes construction of approximately 1800 linear feet of open cell sheet pile (OSCP) bulkhead near the north extension, 1100 linear feet of OSCP near the barge berths, placement of granular fill materials on the North Backlands, North Extension, and South Backlands to create approximately 18.4 acres of new land at the North Extension.

*Id*. Thus, by signing the close-out paperwork, the Contracting Officer indicated, on behalf of MARAD, that it accepted all work performed under the task order as conforming to contract requirements. As such, this evidence provides more than colorable proof of the "conformance" element of the government contractor defense. <u>See</u> <u>Getz</u>, 654 F.3d at 864 (evidence of government receiving report or other

BIRCH HORTON BITTNER & CHEROT
ATTORNEYS AT LAW
1127 WEST SEVENTH AVENUE
ANCHORAGE, ALASKA 99501-3301
TELEPHONE (907) 276-1550 • FACSIMILE (907) 276-3680

acceptance document tends to establish second prong of government contractor defense).

As to the third element of the government contractor defense, MARAD was intimately aware of any potential issues and delays associated with project performance through a myriad of progress reports, daily, weekly, and monthly Project meetings with MARAD, the Port, and the contractors, as well as Defendants' constant communication throughout contract performance and numerous timely emails and memoranda alerting MARAD about potential problems or issues.

For example, included in the thousands of memoranda and emails ICRC sent MARAD during Project performance are numerous alerts regarding problems with sheet pile work and unexpected soil conditions requiring excavation by offshore dredging. See, e.g., July 9, 2008 Email from D. Carlson to Contracting Officer and other MARAD Officials; October 3, 2008 Email from D. Carlson to Contracting Officer and other MARAD Officials; and May 28, 2009 Email from D. Carlson to Contracting Officer and other MARAD Officials (attached as Attachment S to the accompanying declaration of Diana Carlson).

Such evidence, as well as that further described in paragraphs 29, 33 and 34 of Ms. Carlson's declaration, provide sufficient colorable evidence supporting the "warning" prong of the government contractor defense. See Trevino v. Gen. Dynamics Corp., 865 F.2d 1474, 1481 (5th Cir. 1989) (third prong met where contractor advised government about potential problems or hazards).

In short, Defendants have established the government contractor defense as a colorable federal defense to Plaintiff's claims. See Getz, 654 F.3d at 868.

BIRCH HORTON BITTNER & CHEROT
ATTORNEYS AT LAW
1127 WEST SEVENTH AVENUE
ANCHORAGE, ALASKA 99501-3301
TELEPHONE (907) 276-1550 • FACSIMILE (907) 276-3680

MOA V. ICRC, PND AND CH2M HILL                          CASE NO. 3:13-CV-_____
JOINT NOTICE OF REMOVAL                                         PAGE 18 OF 25
F:\506347\1\00309291.DOCX

Case 3:13-cv-00063-SLG   Document 2   Filed 04/10/13   Page 18 of 25

**Derivative Sovereign Immunity.**  Plaintiff's claims also implicate derivative sovereign immunity as a colorable federal defense.   Under derivative sovereign immunity, contractors can be immune from suit when performing work in accordance with a federal government contract.[4]   This doctrine has particular applicability to federal "public works" programs such as the project at issue.  See Yearsley v. Ross Constr. Co., 309 U.S. 18, 20-21 (1940); Ackerson v. Bean Dredging, LLC, 589 F.3d 196, 205-07 (5th Cir. 2009); Mangold v. Analytics Servs., Inc., 77 F.3d 1442, 1447-48 (4th Cir. 1996).  In Yearsley, the Supreme Court held that a government contractor could not be held liable for flooding the plaintiff's land while constructing dikes under the supervision of the Chief of Engineers of the United States pursuant to a public works project on the Missouri River because the work "was all authorized and directed" by the Government and "there is no liability on the part of the contractor for executing [the Government's] will."   309 U.S. at 20-21.   Similarly, in Ackerson, another federal public works construction case, the Fifth Circuit, citing Yearsley, held that dredging companies could not be held liable for alleged environmental damages caused by their dredging activities performed pursuant to federal government contracts.  Ackerson, 589 F.3d at 205-07.  Recently, the Supreme Court reinforced these precepts in Filarsky v. Delia, holding that a private contractor retained by the government to carry out its work is entitled to share the government's immunity from suit.  132 S. Ct. 1657, 1667-68, reh'g denied, 132 S. Ct. 2764 (2012).

---

[4] This case also raises potential issues of indemnification from the United States that provide another basis for immunity.  See Land v. Dollar, 330 U.S. 731, 738 (1947) (for any lawsuit in which "the judgment sought would expend itself on the public treasury . . . , the suit is one against the sovereign") (citations omitted).

BIRCH HORTON BITTNER & CHEROT
ATTORNEYS AT LAW
1127 WEST SEVENTH AVENUE
ANCHORAGE, ALASKA 99501-3301
TELEPHONE (907) 276-1550 • FACSIMILE (907) 276-3680

MOA V. ICRC, PND AND CH2M HILL                    CASE NO. 3:13-CV-_____
JOINT NOTICE OF REMOVAL                                               PAGE 19 OF 25
F:\506347\1\00309291.DOCX

Case 3:13-cv-00063-SLG   Document 2   Filed 04/10/13   Page 19 of 25

Here, Defendants are immune from liability because all of the alleged acts giving rise to Plaintiff's claims were performed pursuant to valid federal public works contracts and all of the allegedly injurious acts were subject to meaningful review and approval by, and direction from, the United States. As just one example, ICRC authorized AIC to use armor rock for tidal protection in an area of the Port known as the North Backlands only after: (1) AIC submitted a Value Engineering Change Proposal to ICRC suggesting use of armor rock; (2) MARAD reviewed AIC's proposal; (3) ICRC sought and obtained approval from the USACE at MARAD's direction; and (4) MARAD instructed ICRC to accept AIC's proposal and proceed accordingly. See Carlson Decl. at ¶¶ 27-28. This is a classic Yearsley example of a contractor performing work in accordance with a federal government contract with every step "authorized and directed" by the United States. 309 U.S. at 20-21.

Because Defendants satisfy all three elements of the federal officer removal test, this case is properly removed pursuant to 28 U.S.C. § 1442.

## IV.  PURSUANT TO 28 U.S.C. § 1441, REMOVAL IS PROPER ON THE GROUNDS OF A FEDERAL QUESTION

Removal of this case is also proper pursuant to 28 U.S.C. § 1441, as it falls within this Court's federal question jurisdiction.

### A.  Federal Enclave Jurisdiction Exists In This Case

Federal question jurisdiction exists here because some of the alleged events giving rise to Plaintiff's claims occurred on a federal enclave. See Durham, 445 F.3d at 1250 (stating that since "some of [plaintiff's] claims arose on federal enclaves," Defendants had thirty days to remove to federal court). Claims arising from incidents that occur on federal enclaves are subject to federal question jurisdiction. See, e.g.,

MOA V. ICRC, PND AND CH2M HILL                              CASE NO. 3:13-CV-_____
JOINT NOTICE OF REMOVAL                                     PAGE 20 OF 25
F:\506347\1\00309291.DOCX

Case 3:13-cv-00063-SLG   Document 2   Filed 04/10/13   Page 20 of 25

Willis v. Craig, 555 F.2d 724, 726 (9th Cir. 1977); Mater v. Holley, 200 F.2d 123, 124 (5th Cir. 1952); Akin v. Gen. Elec. Co., 156 F.3d 1030, 1034 (10th Cir. 1998) ("[p]ersonal injury actions which arise from incidents occurring in federal enclaves may be removed to federal district court as a part of federal question jurisdiction"); Akin v. Big Three Indus., Inc., 851 F. Supp. 819, 822 (E.D. Tex. 1994).

Federal enclave jurisdiction is rooted in article I, section 8, clause 17 of the U.S. Constitution. The United States exercises exclusive jurisdiction over land where such jurisdiction has been conferred by the legislature of the State where the land is located or where jurisdiction was retained over the land when the State was admitted to the Union. Fort Leavenworth R. Co. v. Lowe, 114 U.S. 525, 526-28 (1885); Langford v. Monteith, 102 U.S. 145, 145-46 (1880).

Here, contract performance involved several tasks performed on military land that is subject to federal enclave jurisdiction. As described in Ms. Carlson's declaration, those tasks included constructing two haul roads on Joint-Base Elmendorf Richardson; obtaining earth fill materials from nearby U.S. Air Force property and hauling them to the port construction site; developing the borrow pits from which the earthen materials were extracted; and constructing a flat-bottom drainage channel across the Port and U.S. Air Force property line to provide drainage and access for the U.S. Air Force to maintain an existing contaminated landfill on Air Force property. See Carlson Decl. at ¶ 10.

In order to complete these activities, Ms. Carlson explains in her affidavit that MARAD and the Port entered into a number of agreements with the military for use of its property. For example, in exchange for the right to extract and use earth fill

MOA V. ICRC, PND AND CH2M HILL                    CASE NO. 3:13-CV-_____
JOINT NOTICE OF REMOVAL                                          PAGE 21 OF 25
F:\506347\1\00309291.DOCX

Case 3:13-cv-00063-SLG   Document 2   Filed 04/10/13   Page 21 of 25

materials on Air Force Property, MARAD agreed to lower a hill at the north end of the North-South runway on Joint-Base Elmendorf Richardson. See *Id*.; Memorandum of Agreement Between MARAD and the United States Air Force (Aug. 8, 2005) (attached as Attachment B to the accompanying declaration of Diana Carlson). This work was ultimately performed through contracts MARAD entered into with the Defendants. The Port also entered into lease agreements with both the U.S. Army and the U.S. Air Force so that it could use their land for the Project. See Carlson Decl. at ¶ 10; Resolutions from the Municipality of Anchorage Approving Leases with the U.S. Army and U.S. Air Force (attached as Attachments C and D to the accompanying declaration of Diana Carlson).

For the foregoing reasons, federal enclave jurisdiction exists here because at least some of the alleged events giving rise to Plaintiff's claims occurred on a federal enclave. All claims arising from activities on federal enclaves must be determined in accordance with federal law. See, *e.g.*, Willis, 555 F.2d at 726.

### B. Plaintiff's Claims Against Defendants Inextricably Involve Federal Questions

Removal of this case is also proper based on federal question jurisdiction because this case arises under the Constitution, laws, and treaties of the United States and involves uniquely federal interests. Although Plaintiff asserts only state law causes of action, its Complaint reveals that adjudication of the elements of those causes of action will require this Court to resolve substantial disputed questions of federal law and regulation. The Supreme Court has recognized that even in cases where the causes of action asserted by a plaintiff are couched exclusively in state law terms, federal question jurisdiction exists if resolution of those state law causes of

BIRCH HORTON BITTNER & CHEROT
ATTORNEYS AT LAW
1127 WEST SEVENTH AVENUE
ANCHORAGE, ALASKA 99501-3301
TELEPHONE (907) 276-1550 • FACSIMILE (907) 276-3680

action depends on resolution of substantial predicate questions of federal law. <u>See</u> <u>Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.</u>, 545 U.S. 308, 312 (2005); <u>Franchise Tax Bd. v. Constr. Laborers Vacation Trust</u>, 463 U.S. 1 (1983).

Because Plaintiff's state law causes of action challenge Defendants' conduct that was performed at the direction and control of MARAD pursuant to federal contracts, such causes of action will require this Court to analyze and interpret a myriad of federal laws, directives, and regulations that govern that conduct. For example, adjudication of Plaintiff's claims will require the Court to interpret and apply the myriad provisions from the Federal Acquisition Regulation ("FAR") that were incorporated into the contracts and subcontracts at issue and which controlled the Defendants' project performance. Similarly, adjudication of this case may also require the Court to analyze the Contract Disputes Act ("CDA"), which governs disputes between the Government and contractors performing federal government contracts. [5]

Plaintiff's claims also implicate federal fiscal law as project funding—and consequently project performance—was affected not only Plaintiff's repeated funding shortfalls, but also by the relevant federal appropriations statutes, including the Anti-Deficiency Act, 31 U.S.C. § 1341, The Economy Act, 31 U.S.C. § 1535, and the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users ("SAFETEA-LU"), Pub. L. No. 109-59, § 10205, 119 Stat. 1144 (2005).

---

[5] Indeed, Plaintiff acknowledges that a CDA claim arising from the Project already has been filed in a federal forum, the United States Civilian Board of Contract Appeals. <u>See</u> Complaint at ¶ 192.

BIRCH HORTON BITTNER & CHEROT
ATTORNEYS AT LAW
1127 WEST SEVENTH AVENUE
ANCHORAGE, ALASKA 99501-3301
TELEPHONE (907) 276-1550 • FACSIMILE (907) 276-3680

MOA V. ICRC, PND AND CH2M HILL                   CASE NO. 3:13-CV-_____
JOINT NOTICE OF REMOVAL                                       PAGE 23 OF 25
F:\506347\1\00309291.DOCX

Case 3:13-cv-00063-SLG   Document 2   Filed 04/10/13   Page 23 of 25

Finally, because environmental permitting issues impacted project performance, Plaintiff's claims also implicate the Rivers and Harbor Act of 1899 and the Clean Water Act and the USACE's application thereof in its review and approval of the design and construction elements of the Project.

Simply put, no amount of artful pleading by Plaintiff can change the fact that the state law causes of action it asserts in its Complaint will require the Court to analyze and interpret a host of federal statutes, doctrines, immunities, contractual provisions, regulations, and military protocols governing Defendants' alleged conduct. As such, removal to this Court is proper because federal question jurisdiction exists under 28 U.S.C. §§ 1331 and 1441.

WHEREFORE, Defendants ICRC and PND hereby remove this action to the United States District Court for the District of Alaska.

DATED this 9th day of April, 2013.

<div style="margin-left:40%">

BIRCH HORTON BITTNER & CHEROT
Attorneys for Defendant INTEGRATED
CONCEPTS AND RESEARCH CORPORATION,
a corporation


By:  /s/ David Karl Gross_____
      Max D. Garner, ABA #9011096
      David Karl Gross, ABA #9611065
      Adam W. Cook, ABA #0611071
      1127 West Seventh Avenue
      Anchorage, AK 99501
      Telephone:  907.276.1550
      Facsimile:  907.276.3680
      Email:      dgross@bhb.com

</div>

BIRCH HORTON BITTNER & CHEROT
ATTORNEYS AT LAW
1127 WEST SEVENTH AVENUE
ANCHORAGE, ALASKA 99501-3301
TELEPHONE (907) 276-1550 • FACSIMILE (907) 276-3680

MOA V. ICRC, PND AND CH2M HILL          CASE NO. 3:13-CV-_____
JOINT NOTICE OF REMOVAL          PAGE 24 OF 25
F:\506347\1\00309291.DOCX

Case 3:13-cv-00063-SLG   Document 2   Filed 04/10/13   Page 24 of 25

DORSEY WHITNEY
Attorneys for Defendant PND ENGINEERS, INC.,
a corporation

By:   /s/ Lisa M. Marchese – with consent
      Lisa M. Marchese, ABA #1102004
      1031 West Fourth Avenue
      Suite 600
      Anchorage, AK 99501-5907
      Telephone:  907-276-4557
      Facsimile:  907-276-4152
      marchese.lisa@dorsey.com

<u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on the 9th day of
April, 2013, a true and correct copy of the foregoing was
served on the following in the manner indicated:

Robert P. Owens
owensrp@muni.org

Bennett J. Lee
blee@wthf.com

Christopher Wright
cwright@wthf.com

BIRCH HORTON BITTNER & CHEROT

By:      /s/ David Karl Gross

BIRCH HORTON BITTNER & CHEROT
ATTORNEYS AT LAW
1127 WEST SEVENTH AVENUE
ANCHORAGE, ALASKA 99501-3301
TELEPHONE (907) 276-1550 • FACSIMILE (907) 276-3680

MOA V. ICRC, PND AND CH2M HILL      CASE NO. 3:13-CV-_____
JOINT NOTICE OF REMOVAL      PAGE 25 OF 25
F:\506347\1\00309291.DOCX

Case 3:13-cv-00063-SLG   Document 2   Filed 04/10/13   Page 25 of 25