# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

ANCHORAGE, A MUNICIPAL
CORPORATION,

                         Plaintiff,

        v.

INTEGRATED CONCEPTS AND
RESEARCH CORPORATION, PND
ENGINEERS, INC., and CH2M HILL
ALASKA, INC.,

                         Defendants.

Case No. 3:13-cv-00063-SLG

## ORDER RE MOTION TO REMAND AND RELATED MOTIONS

Before the Court at Docket 21 is a motion to remand this action to state court filed by Plaintiff Municipality of Anchorage ("MOA") on May 10, 2013. Defendant Integrated Concepts and Research Corporation ("ICRC") opposed the motion, and Defendant PND Engineers, Inc. ("PND") joined in ICRC's opposition.[1] MOA replied.[2] Oral argument was held on July 12, 2013.[3] For the reasons set forth below, the Court will deny the motion to remand.

After oral argument, at Docket 55, Defendant ICRC submitted a motion for leave to file a supplemental brief in opposition to the motion to remand. MOA opposed the motion, and ICRC replied.[4] The Court will deny the motion to supplement as

---

[1] Docket 30 (ICRC Opp.); Docket 31 (PND Opp.).

[2] Docket 34 (MOA Reply).

[3] Docket 44 (Minute Entry).

[4] Docket 61 (MOA Opp.); Docket 63 (ICRC Reply).

unnecessary.[5]  Also, at Docket 64, ICRC filed a Notice of Supplemental Authority, directing the Court to an audio recording of an oral argument that was recently held before the Ninth Circuit in *Leite v. Crane Co.*,[6] a district court decision cited in the parties' briefing.  At Docket 65, MOA moved to strike, and ICRC opposed at Docket 66. The Court will deny the motion to strike, as the Court has listened to the recording (and in fact had intended to listen to the recording before the Notice was filed).  However, the oral argument has not been considered by the Court as persuasive authority, but rather as an opportunity to learn how other judicial officers have reflected on the federal officer removal statute.

## FACTUAL AND PROCEDURAL BACKGROUND

In this litigation, Plaintiff MOA asserts that Defendants ICRC, PND, and CH2M Hill Alaska, Inc. ("CH2M") defectively designed and executed construction of the Port of Anchorage Intermodal Expansion Project (the "Project).  MOA owns the Project.[7]  The goals of the Project included "expansion of commercial dock space, barge terminal development, road and rail access development," and other efforts "to improve and increase commercial operations" and "to establish a strategic platform and port of embarkation for the immediate deployment of U.S. military forces."[8]

---

[5]  A cursory review of the motion to supplement indicates that a majority of cases cited in it had been previously cited to the Court or cited within those cases.

[6]  *Leite v. Crane Co.*, 868 F.Supp.2d 1023, 1028 (D. Hawaii 2012), No. 12-16864 (9th Cir. argued Oct. 8, 2013).

[7]  Docket 21-2 at 2 ¶ 4 (5/9/13 Cowles Decl.).

[8]  Docket 2-2 at 9-10 ¶¶ 11, 14-15 (Compl.); Docket 2-3 at 2 ¶ 4 (4/8/13 Carlson Decl.); Docket 2-8 at 18 (Attachment E to Carlson Decl.:  05/03 Contract).

## I. Contract Between MarAd and ICRC

In March 2003, MOA and its department, the Port of Anchorage (the "Port"), signed a Memorandum of Understanding ("MOU") with the U.S. Department of Transportation's Maritime Administration ("MarAd") to oversee the Project.[9] Through this MOU, the "Port would retain "programmatic and technical controls" of the Project, with MarAd to "[p]rovide specialized technical expertise and input as appropriate."[10]

MarAd, in turn, contracted with ICRC's predecessor, and later with ICRC, to provide a wide variety of contract management services, including "technical management, staff augmentation, port planning, environmental documentation and permitting services, design management, construction management, contractor management, and military support services."[11] ICRC, in turn, contracted with Defendants PND and VECO, Alaska, Inc., now CH2M, for technical support and engineering services, including assistance inspecting the technology selected for the Project, the Open Cell Sheet Pile ("OCSP").[12]

---

[9] See Docket 2-2 at 9-10 ¶¶ 14-15 (Compl.); Docket 2-12 (Attachment I to Carlson Decl.: 2003 MOA Assembly Memorandum and MOU).

[10] Docket 2-12 at 6, 10; see also Docket 30-1 at 2 ¶ 3 (5/28/13 Supp. Carlson Decl.).

[11] Docket 2-3 at 5 ¶ 11 (4/8/13 Carlson Decl.); see also Docket 2-2 at 10-11 ¶¶ 18-21; Docket 2-8 at 19-25 (Attachment E to Carlson Decl.: 05/03 Contract).

[12] There is some inconsistency in the briefing concerning whether it was ICRC or PND that initially contracted with CH2M. See Docket 2 at 7 (Notice of Joint Removal by ICRC and PND) ("ICRC contracted with Defendants PND . . . and CH2M . . . for technical support and engineering services required for the Project."); Docket 21-2 at 6, 8 ¶¶ 15, 25 (5/9/13 Cowles Decl.) ("PND contracted with VECO to perform certain stability analyses underlying the use of the OCSP system"); see also Docket 21-20 (Ex. 16 to Motion to Remand: OCSP Wall Stability Analyses); Docket 21-21 at 13 (Ex. 17 to Motion to Remand: Geotechnical Analysis Report); Docket 30-8 at 2 (Attachment G to Supp. Carlson Decl: 2/24/06 ICRC Memorandum). This inconsistency does not affect this opinion.

ICRC asserts that MarAd and other government agencies, including the U.S. Army Corps of Engineers, exercised a "high level of control and supervision . . . over every aspect of ICRC's role in the Project."[13]  But MOA asserts that ICRC was "an independent contractor (and not an agent of the Government)."[14]

The 2003 contract between MarAd and ICRC's predecessor was an indefinite delivery, indefinite quantity contract, which meant that ICRC would submit specifications with cost and time estimates to MarAd, which could modify those estimates before issuing task orders specifying the work to be performed by ICRC.[15]  The contract required that ICRC send MarAd periodic reports, setting forth "significant findings, problems, delays, inclusions, events, [and] trends, etc. of the reporting period which result from or affect the performance of the contract."[16]

In 2005, MOA and MarAd entered into an addendum to the MOU, which "specifie[d] the manner by which MARAD agreed to accept Project work from ICRC."[17] The addendum indicated that ICRC would prepare a Certificate of Completion for completed work to be submitted to both the MOA and MarAd for review and approval.[18]

---

[13]  Docket 2-3 at 3 ¶ 7(4/8/13 Carlson Decl.); Docket 30-1 (5/28/13 Supp. Carlson Decl.).

[14]  Docket 21 at 1 (Mot. To Remand); Docket 21-2 at 2, ¶ 3 (5/9/13 Cowles Decl.) ("ICRC was acting as an independent contractor" to MarAd).

[15]  Docket 2-3 at 6 ¶ 12; Docket 2-8 at 4 ¶ F.1 (Attachment E to Carlson Decl.:  05/03 Contract); *see also* Docket 2-10 (Attachment G to Carlson Decl.:  11/4/09 Agenda) (describing various task orders).

[16]  Docket 2-3 at 6 ¶ 12; Docket 2-8 at 4 ¶ F.4; *see also* Docket 21-10 at 3 (Task Order 111 Statement of Work).

[17]  Docket 2-3 at 8 ¶ 18.

[18]  *Id.*; *see, e.g.,* Docket 2-13 (Attachment J to Carlson Decl.:  6/29/07 Cert. of Completion).

In July 2008, MarAd issued a second contract to ICRC, with terms similar to the 2003 contract.[19]

## II. MOA Files a Lawsuit; Procedural History

MOA filed this action in Alaska Superior Court on March 8, 2013, asserting claims for breach of contract, professional negligence, and negligence.[20]  In the complaint, MOA alleged that as of that time, "the Project work [wa]s currently on hold," and that "the completion date for the Project ha[d] been significantly pushed back."[21] MOA further alleged that there were "various deficiencies in the Project's administration, design, and construction" attributable to the Defendants, including "[p]roducing an OCSP design that is inadequate"; "[p]rescribing" certain construction methods which negatively impacted the Project; "[f]ailing to develop a testing protocol to verify the interlock integrity" of the OCSP design; and "[i]gnoring signs [of] significant problems[.]"[22]

Defendants ICRC and PND removed this action to federal court on April 10, 2013, asserting several grounds for federal jurisdiction, including:

1.  Removal pursuant to 28 U.S.C. § 1442, the federal officer removal statute; and

---

[19]  Docket 2-3 at 6 ¶ 13 (4/8/13 Carlson Decl.); Docket 2-9 at 2 (Attachment F to Carlson Decl.: 07/08 Contract).

[20]  Docket 2-2 at 1, ¶¶ 47-52 (Compl.).

[21]  *Id.* at ¶¶ 198-99.

[22]  *Id.* at ¶ 204.

2. Removal pursuant to 28 U.S.C. § 1441(a), the federal question removal statute, because the events occurred on a federal enclave and because the claims involve federal questions.[23]

Defendant CH2M consented to removal.[24] CH2M and PND then answered the complaint on April 15 and 17, 2013, respectively.[25] On April 17, 2013, ICRC filed a Motion to Dismiss in lieu of answering.[26] That motion is currently pending and is not addressed by this Order.

On May 10, 2013, MOA filed the motion to remand this matter to state court.[27] ICRC opposed the motion, asserting the same grounds for federal jurisdiction as had been asserted in the notice of removal.[28] PND joined in the opposition,[29] and MOA replied.[30] Oral argument was held on July 12, 2013.

In this Order, the Court concludes that it has federal jurisdiction pursuant to Section 1442(a)(1), the federal officer removal statute. The Court does not reach the alternative grounds for jurisdiction presented by Defendants.

---

[23] Docket 2 (Notice of Joint Removal by ICRC and PND).

[24] Docket 1 (Notice of Consent by CH2M). The Court notes, however, that for purposes of section 1442, a single defendant may unilaterally remove and obtain federal jurisdiction. *See Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1253 (9th Cir. 2006) ("Whereas all defendants must consent to removal under section 1441, . . . a federal officer or agency defendant can unilaterally remove a case under section 1442.").

[25] Docket 8 (CH2M Answer); Docket 10 (PND Answer).

[26] Docket 12 (Mot. to Dismiss).

[27] Docket 21 (Mot. To Remand).

[28] Docket 30 (ICRC Opp.); *see also* Docket 2 (Notice of Joint Removal by ICRC and PND).

[29] Docket 31 (PND Opp.).

[30] Docket 34 (Reply).

**DISCUSSION**

Ordinarily, "removal statutes," such as the general removal statute, 28 U.S.C. § 1441, "are to be strictly construed, and any doubts as to the right of removal must be resolved in favor of remanding to state court."[31]  However, that standard does not apply to removals under 28 U.S.C. § 1442(a)(1), the federal officer removal statute. Section 1442(a)(1) allows removal when an action in state court is commenced against the United States, an agency of the United States, or "any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity . . . ."[32]  The Supreme Court has explained that, "one of the primary purposes of the removal statute -- as its history clearly demonstrates -- was to have such defenses litigated in the federal courts."[33]  Indeed, "[i]f the federal government can't guarantee its agents access to a federal forum if they are sued or prosecuted, it may have difficulty finding anyone willing to act on its behalf."[34]  Accordingly, "the Supreme Court has mandated a generous interpretation of the federal officer removal statute," and has instructed lower courts to avoid "a narrow, grudging interpretation of § 1442(a)(1)."[35]

The party seeking removal under section 1442(a)(1) must demonstrate that:  (1) the defendant is a "person" within the meaning of the statute that was "acting under" a

---

[31]  *Durham*, 445 F.3d at 1252 (restating district court's analysis of law, noting it was supported by *Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir. 1992)).

[32]  28 U.S.C. § 1442(a)(1).

[33]  *Willingham v. Morgan*, 395 U.S. 402, 407 (1969).

[34]  *Durham*, 445 F.3d at 1253.

[35]  *Id.* at 1251-52 (internal citations omitted).

federal officer; (2) there is a "causal nexus" between the defendant's actions taken pursuant to a federal officer's directions, and the plaintiff's claims; and (3) the defendant can assert a "colorable federal defense."[36]

In determining whether it has subject matter jurisdiction, a court may review evidence in the record, including affidavits and documents.[37] However, when a defendant asserts federal officer removal jurisdiction, the Supreme Court has explained that a court should "credit the [defendant's] theory of the case for purposes of [the causal connection and colorable defense] elements of [the] jurisdictional inquiry."[38] ICRC provides two declarations of Diana Carlson, a manager and Vice President of Operations at ICRC during the relevant time period, along with exhibits, to support its assertion that the district court has subject matter jurisdiction under section 1442(a)(1).[39] MOA provides the declaration of Todd Cowles, Port Engineer for MOA since 2005, along with exhibits, to support its position that ICRC fails to meet any of the

---

[36] *Id.* at 1251 (citing *Jefferson Cnty. v. Acker*, 527 U.S. 423, 431 (1999)). Section 1442 cases sometimes list out a four-part test, but either test contains the same basic elements. *See Bennett v. MIS Corp.*, 607 F.3d 1076, 1085 (6th Cir. 2010) (citing *Jefferson Cnty.*, 527 U.S. at 431).

[37] *See Sesay v. Raytheon Aircraft Co.*, No. 2:11-cv-05876-JHN, 2012 U.S. Dist. LEXIS 1985, at *5 (C.D. Cal. Jan. 5, 2012); *see also Bennett*, 607 F.3d at 1087 n.11 ("When a district court's subject matter jurisdiction is in question, it is empowered to review extra-complaint evidence and resolve factual disputes.").

[38] *Jefferson Cnty*, 527 U.S. at 432. *Jefferson County* addressed removal under 28 § 1442(a)(3), which applies to judicial officers of the United States, but it provides for similar removal rights as under subsection (a)(1) at issue here.

[39] Docket 2-3 at 3 ¶ 7(4/8/13 Carlson Decl.); Docket 30-1 (5/28/13 Supp. Carlson Decl.).

three requirements for federal officer removal jurisdiction.[40]  The Court addresses each requirement in turn.

## I.  For Purposes of Section 1442 Removal, ICRC has Demonstrated that it was a "Person Acting Under" MarAd.[41]

In order to be "acting under" federal authority, a person's actions "must involve an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior."[42] These actions must "help[] officers [to] fulfill other basic governmental tasks . . . that, in the absence of a contract with a private firm, the Government itself would have had to perform."[43]  Although certainly not limitless, "[t]he words 'acting under' are broad, and th[e Supreme] Court has made clear that the statute must be 'liberally construed.'"[44]

MOA contends that ICRC was not "acting under" MarAd because this suit arises from ICRC's actions "performing its independent contractual duties pursuant to its contract with MarAd."[45]  MOA also asserts that ICRC was not acting under MarAd because ICRC could not bind, make decisions for, or act on MarAd's behalf.[46]

---

[40]  Docket 21 (Mot.); Docket 21-2 (5/9/13 Cowles Decl.).

[41]  MOA does not dispute that Defendants were "persons" for purposes of federal officer removal; rather, it disputes whether the Defendants were "acting under" MarAd.

[42]  *Watson v. Philip Morris Co.*, 551 U.S. 142, 152 (2007) (emphasis in original).

[43]  *Id.* at 153-54.

[44]  *Id.* at 147.

[45]  Docket 21 at 12 (Mot.).

[46]  *Id.* at 12-13.

ICRC asserts that "[t]he Complaint . . . effectively establish[es] that the Defendants were working at the direction of, and subject to the approval by, MARAD."[47] ICRC further asserts that, "the government contracts between ICRC and MarAd clearly set forth duties, that in the absence of the contracts with ICRC, the Government itself would have had to perform."[48]

MOA cites *Cabalce v. VSE Corp.*,[49] a case in which the District Court for the District of Hawaii granted a plaintiff's motion to remand. The district court found that the claims were not removable under the federal officer removal statute as defendant failed to satisfy either the "acting under" or "causal nexus" requirements.[50] In so finding, the court noted that it had previously found that the defendant was an "independent contractor" acting "without day-to-day control or supervision by the government," such that the United States could not be held liable for the defendant's acts under the Federal Tort Claims Act. But whether a federal contractor is termed an "independent contractor" is not dispositive of section 1442 removal. The focus for this inquiry is instead whether the contractor assisted or helped the government, and performed duties that the government would otherwise have to perform. In any event, *Cabalce* is distinguishable from the case at hand because in *Cabalce*, the court concluded that the government did not exercise day-to-day control over the contractor, while here, Carlson's declarations

---

[47] Docket 2 at 11 (Notice of Joint Removal by ICRC and PND); Docket 30 at 9 (ICRC Opp.).

[48] Docket 30 at 7 (ICRC Opp.).

[49] *Cabalce v. VSE Corp.*, 922 F.Supp.2d 1113, 1122 (D. Hawaii 2013).

[50] *Id.* at 1124. *Cabalce* considers together the "acting under" and "causal nexus" requirements.

assert that MarAd did exercise day-to-day supervision through daily communications,[51] by maintaining an on-site representative at ICRC's offices in Anchorage, through MarAd representatives' "frequent" visits to ICRC's offices,[52] and by requiring ICRC to provide "periodic progress reports."[53]

Here, there is no factual dispute that MOA entered into an MOU with MarAd, which then contracted with ICRC to provide a range of management services for the Project. Likewise, there is no factual dispute that MarAd executed task orders directing ICRC to perform specific work. That is, MarAd enlisted ICRC to assist MarAd to accomplish MarAd's responsibilities under the MOU. As noted above, the "acting under" requirement is to be liberally construed.[54] On the current record before the Court, ICRC has demonstrated that it was "acting under" MarAd for purposes of section 1442 removal jurisdiction.

## II. For Purposes of Section 1442 Removal, ICRC has Demonstrated a "Causal Nexus."

To satisfy the second element of the test for federal officer removal, the removing party must show a "'causal connection' between the charged conduct and asserted official authority."[55] That is, "the removing party must show that it is being sued

---

[51] Docket 2-3 at 7 ¶ 15 (Carlson Decl.).

[52] Docket 2-3 at 7 ¶¶ 14, 16, 18 (Carlson Decl.).

[53] *Id.* at 7, 14 ¶¶ 14, 33.

[54] *See Watson*, 551 U.S. at 147.

[55] *Jefferson Cnty*, 527 U.S. at 431 (quoting *Willingham*, 395 U.S. at 409).

because of the acts it performed at the direction of the federal officer."[56]  A causal nexus requires "the defendant to show that it acted at the federal government's command" with respect to the charged conduct.[57]  But "demanding an airtight case on the merits in order to show the required causal connection" would "defeat the purpose of the removal statute."[58]  Rather, a defendant's evidence in support of the requisite causal connection should be generously interpreted in favor of federal office removal.[59]

MOA claims that ICRC negligently performed various obligations that it had related to the Project.  MOA asserts that "because ICRC and its subcontractors had discretion over many items, including development and implementation of the [OCSP] design, [t]he conduct that injured MOA was not the result of direct and detailed control by MarAd, but simply ICRC's own failures and negligence in the design, construction and management of the Project."[60]  MOA provides several examples of ICRC's alleged negligence, including: (1) selection and implementation of the OCSP technology; and (2) selection and oversight of subcontractors.[61]

With respect to the OCSP design, MOA maintains that MarAd "did not dictate that ICRC recommend the OCSP design."[62]  In Cowles's declaration, he states that

---

[56] *Bennett*, 607 F.3d at 1089.

[57] *Leite*, 868 F.Supp.2d at 1041 (quoting *Hagen v. Benjamin Foster Co.*, 739 F.Supp.2d 770, 785 (E.D. Penn. 2010)).

[58] *Jefferson Cnty.*, 527 U.S. at 432.

[59] *Durham*, 445 F.3d at 1253.

[60] Docket 21 at 14 (Mot.).

[61] *See* Docket 2-3 at 3 ¶ 6 (4/8/13 Carlson Decl.); Docket 21 at 9-10, 14 (Mot. to Remand).

[62] Docket 21 at 13.

"ICRC was intimately and critically involved in analyzing the viability of the [OCSP] design at the Project," that "MarAd relied upon ICRC's analysis to determine the viability of the [OCSP] design," and that "[b]oth MarAd and MOA relied upon ICRC . . . for analysis and validation of the OCSP design recommended by ICRC."[63]   However, Cowles does not directly address the key question of how much oversight MarAd exercised over ICRC.   In contrast, Carlson states that "[t]he Port made the initial suggestion that OCSP technology be used instead of alternative methods,"[64] that MarAd supervised "the initial evaluation and selection of technology,"[65] and that MarAd issued task orders related to the selection of the OCSP technology, including a request for an environmental assessment comparing the different technologies.[66]   Carlson adds that ICRC's work was "subject to vigorous review, comment and modification by MARAD and the Port," as well as the U.S. Army Corps of Engineers.[67]   Carlson further asserts that after MarAd approved the OCSP design, ICRC could not unilaterally change the specifications without MarAd's written approval.[68]   Liberally construing Carlson's declarations and the supporting documents, ICRC has sufficiently

---

[63]  Docket 21-2 at 8, ¶ 27 (5/9/13 Cowles Decl.).

[64]  Docket 2-3 at 10 ¶ 21 (4/8/13 Carlson Decl.).

[65]  *Id.* at 3 ¶ 7.

[66]  *See id.* at 3, 10-11 ¶¶ 7, 21, 23; Docket 21-2 at 8 ¶¶ 22-23.  Carlson also asserts that "ICRC did not independently prepare the . . . EA" because "MARAD and the Port had a heavy hand in drafting the EA."  Docket 30-1 at 3 ¶ 6 (5/28/13 Supp. Carlson Decl.).

[67]  Docket 2-3 at 10 ¶ 23.

[68]  *Id.* at 10-12 ¶¶ 22, 25.

demonstrated the requisite causal nexus between MarAd's instructions and the selection of the OCSP technology as required for federal officer removal jurisdiction.

MOA also asserts that ICRC was negligent in its selection and oversight of subcontractors. As one example, in his declaration, Cowles describes the process involved in the issuance of Task Order 312, through which ICRC requested certain funding related to subcontractor PND.[69] Cowles states that after ICRC requested the funding, MarAd provided no substantive comments before issuing that particular task order, and that "MarAd typically did not provide any significant comments."[70] But Cowles's declaration is not determinative—his statement that MarAd *typically* did not provide significant comments to ICRC is not conclusive as to whether it *sometimes* did provide significant commentary. In contrast, Carlson's declarations provide specific examples of alleged government oversight. For instance, Carlson asserts that during the RFP process, ICRC alerted the Port and MarAd that several contractors sought to propose alternatives to the OCSP design, and requested that the terms "or similar" be placed in the pending RFPs near each OCSP reference, but that MarAd rejected ICRC's suggestion.[71] As another example, Carlson describes how when a subcontractor proposed using armor rock in the North Backlands, ICRC was unable to "act unilaterally" on the recommendation.[72] Instead, ICRC forwarded the proposal to MarAd for approval, which then required that ICRC take certain steps, including seeking

---

[69] *See* Docket 21-2 at 6 ¶ 13 (5/9/13 Cowles Decl.).

[70] *Id.*

[71] Docket 30-1 at 5 ¶ 10 (5/28/13 Supp. Carlson Decl.).

[72] Docket 2-3 at 12-13 ¶¶ 27-28 (4/8/13 Carlson Decl.).

endorsement from the U.S. Army Corps of Engineers, before MarAd would issue approval.[73]   Again, ICRC has sufficiently demonstrated for purposes of section 1442 removal jurisdiction the requisite casual nexus between MarAd's oversight and ICRC's actions.

## III.   For Purposes of Section 1442 Removal, ICRC Presents a "Colorable" Federal Defense.

The Supreme Court has explained that "federal officer removal must be predicated on a federal defense."[74]   And yet at the removal stage, the defense need not "be clearly sustainable."[75]   Rather, for purposes of obtaining federal jurisdiction, the contractor need only show a "plausible" or "colorable" defense.[76]   Such a showing entitles a defendant to a federal forum in which to litigate the validity of the federal defense.[77]   For purposes of determining whether a defense is colorable, the facts are viewed in the light most favorable to the defendant.[78]

---

[73]   *Id.*; Docket 2-20 at 5 (Attachment Q to Carlson Decl.:  7/25/06 MarAd email to ICRC); Docket 21-26 (Ex. 22 to Motion to Remand:  ICRC Letter to Port re 405 North Backlands).

[74]   *Mesa v. California*, 489 U.S. 121, 130 (1989).

[75]   *Leite*, 868 F.Supp.2d at 1028 (quoting *Willingham*, 395 U.S. at 407); *see also Magnin v. Teledyne Continental Motors*, 91 F.3d 1424, 1427 (11th Cir. 1996) (The "ultimate validity" of the defense "is not to be determined at the time of removal.").

[76]   *Bennett*, 607 F.3d at 1089; *see also* Black's Law Dictionary 282 (9th ed. 2009) (A "colorable claim" is a "claim that is legitimate and that may reasonably be asserted, given the facts presented and the current law (or a reasonable and logical extension or modification of the current law).").

[77]   *Leite*, 868 F.Supp.2d at 1028 (quoting *Willingham*, 395 U.S. at 407).

[78]   *Leite*, 868 F.Supp.2d at 1030-31; *Thompson v. Crane Co.*, No. 11-cv-638-LEK-RLP, 2012 U.S. Dist. LEXIS 84569 (D. Hawaii Jun. 19, 2012).

Here, ICRC asserts that jurisdiction is proper under either of two alternative colorable federal defenses: the government contractor defense or derivative sovereign immunity.[79] This Order addresses only the government contractor defense.

A contractor establishes this defense by demonstrating that: (1) the government approved reasonably precise specifications; (2) the project conformed to those specifications; and (3) the contractor warned the United States about the dangers of the project specifications that were known to the contractor but not to the United States.[80] The government contractor defense is intended to "protect[] a government contractor from liability for acts done by him while complying with government specifications during the execution of performance of a contract with the United States."[81]

Before turning to the three elements of the defense, the Court must first determine whether ICRC may plausibly invoke the defense with respect to the Port project. On this issue, MOA cites to the Ninth Circuit's decision in *Snell v. Bell Helicopter Textron, Inc.*, where the court stated that the government contractor defense is "only available to contractors who design and manufacture military equipment" in accordance with the government's specifications.[82] MOA argues that because "ICRC

---

[79] Docket 2 at 14, 19 (Notice of Joint Removal by ICRC and PND).

[80] *Getz v. Boeing Co.*, 654 F.3d 852, 861 (9th Cir. 2011) (citing *Boyle v. United Techs. Corp.*, 487 U.S. 500, 512 (1988)) (describing three elements of the defense in the context of helicopter manufactured and sold to United States government); *McKay v. Rockwell Int'l Corp.*, 704 F.2d 444, 448 (9th Cir. 1983); *Leite*, 868 F.Supp.2d at 1028.

[81] *McKay*, 704 F.2d at 448 (discussing *Yearsley v. W.A. Ross Construction Company*, 309 U.S. 18 (1940)).

[82] Docket 21 at 13 (Mot.) (citing *Snell v. Bell Helicopter Textron, Inc.*, 107 F.3d 744, 746 n.1 (9th Cir. 1997) (internal citations omitted). However, as *Snell* involved a military helicopter, its statement as to the scope of the defense could be considered as dicta. *See also Rodriguez v. Lockheed Martin Corp.*, 627 F.3d 1259, 1265 (9th Cir. 2010) (in a case involving military

did not design and manufacture military equipment, but rather contracted with MarAd, a civilian agency, to design and construct a local infrastructure project," the defense is completely unavailable to it.[83]

ICRC concedes that "the Ninth Circuit has not . . . applied the government contractor defense outside of military contracts."[84]  But ICRC asserts that by "logical extension" of the U.S. Supreme Court's decisions in *Yearsley v. W.A. Ross Construction Company*[85] and *Boyle v. United Technologies Corp.*,[86] ICRC can advance a plausible government contractor defense. [87]

In *Yearsley,* a Supreme Court case decided in 1940, the government contracted with a private company to construct dikes.[88]  The plaintiff later sued the private company, claiming that the dikes caused erosion to his property.  In its analysis, the Supreme Court recognized the policy that supports the modern-day government contractor defense:

---

equipment, the Ninth Circuit described defense as shielding contractors from "[l]iability for design defects in military equipment").

[83]  Docket 21 at 14 (Mot.).

[84]  Docket 30 at 12 (ICRC Opp.).

[85]  *Yearsley*, 309 U.S. 18.

[86]  *Boyle*, 487 U.S. at 512.

[87]  Docket 30 at 12 (ICRC Opp.).

[88]  *Yearsley*, 309 U.S. 18.

> [I]f this authority to carry out the project was validly conferred, that is, if what was done was within the constitutional power of Congress, there is no liability on the part of the contractor for executing its will.[89]

But the *Yearsley* decision seemed to "[l]imit[] the applicability of the defense [as applied in that case] to principal-agent relationships where the agent had no discretion in the design process and completely followed government specifications."[90] It does not appear that MaRad exercised that level of control over ICRC. But this Court also notes that *Yearsley* did not involve a military contract and yet still recognized that a government contractor may avoid liability when following government directives.

In 1988, the Supreme Court recognized the government contractor defense, in its current form, in *Boyle*.[91] In that case, an individual had drowned when he was unable to escape a Marine helicopter that crashed into the ocean because of a design defect. The individual's father sued the helicopter's manufacturer, which invoked the federal contractor defense. Explaining the defense, taking into account the policy expressed in *Yearsley*, the Supreme Court stated:

> The federal interest justifying th[e] holding [in *Yearsley*] surely exists as much in procurement contracts as in performance contracts; we see no basis for a distinction.[92]

---

[89] *Id.* at 22. This policy may also support a claim for derivative sovereign immunity. *But see Rodriquez*, 627 F.3d at 1265 ("Although the source of the government contractor defense is the United States' sovereign immunity, we have explicitly stated that 'the government contractor defense does not confer sovereign immunity on contractors.'" (quoting *United States ex rel. Ali v. Danie, Mann, Johnson & Mendenhall*, 355 F.3d 1140, 1147 (9th Cir. 2004))).

[90] *Hanford Nuclear Reserv. Litig. v. E.I. DuPont de Nemours & Co. (In re Hanford Nuclear Reserv. Litig.)*, 534 F.3d 986, 1001 (9th Cir. 2008) (discussing *Yearsley*, 309 U.S. 18).

[91] *Boyle*, 487 U.S. at 512.

[92] *Id.* at 506; *see also Bennett*, 607 F.3d at 1089 (stating "it is at least plausible that the government contractor defense could apply outside the military procurement contract context," and noting that defense originated in *Yearsley*); *Cabalce*, 922 F.Supp.2d at 1124 (noting

This Court finds that the stated policy from *Yearsley* and *Boyle* supports a finding that the government contractor defense could plausibly be invoked by a contractor hired by a federal civilian agency to design and construct a local infrastructure project.[93]

The Court next addresses whether ICRC has demonstrated that it may plausibly satisfy the three elements of the government contractor defense. The Court considers the facts in the light most favorable to ICRC, and concludes that ICRC has made out a "colorable defense" for purposes of section 1442 jurisdiction.

### A. The Government Approved Reasonably Precise Specifications.

To meet the first element—that the United States approved reasonably precise specifications—a contractor must show that the government's approval was "more than a cursory 'rubber stamp' approving the design."[94] It must show that the approval resulted "from a 'continuous exchange' and 'back and forth dialogue' between the contractor and the government."[95] For example, if the "government engages in a thorough review of the allegedly defective design and takes an active role in testing and implementing that design," the first element is met.[96]

---

"significant split in authority" on question of whether government contractor defense applies in a non-military context, but noting that *Boyle* was derived from *Yearsley*).

[93] *See also Merritt, Chapman, & Scott Corp. v. Atkinson*, 295 F.2d 14 (9th Cir. 1961) (after jury trial, private firm that contracted with government to build a dam was found not to be protected by government contractor defense because critical construction decisions left to contractor's discretion).

[94] *Getz*, 654 F.3d at 861 (internal citations omitted).

[95] *Id.*

[96] *Id.*

MOA asserts that ICRC cannot demonstrate that it followed reasonably precise specifications because "ICRC was responsible for identifying construction requirements, developing Task Orders for construction, executing the construction contract, and managing and inspecting the construction of the Project."[97]   MOA also asserts that ICRC, "not MarAd, performed the thorough review of the defective OCSP design."[98] Essentially, MOA argues that ICRC, not MarAd, determined the specifications.

ICRC, through Carlson's declarations, describes MarAd as having had an active role in developing and approving the specifications.   Carlson asserts that "MARAD either mandated or meaningfully reviewed, revised, verified and ultimately approved the detailed specifications used for every aspect of the Project."[99]   This occurred through the task order process, through which MarAd issued task orders to ICRC.[100]   According to Carlson, ICRC may have made the initial proposals, but MarAd would modify them as it determined necessary prior to issuing the task orders.[101]

ICRC's evidence regarding the selection of the OCSP technology provides a useful example of MarAd's involvement in developing and approving specifications. Carlson asserts that the Port initially proposed use of the OCSP technology.[102]   Before proceeding with that technology, however, MarAd requested that ICRC prepare draft

---

[97]   Docket 21 at 15 (Mot.).

[98]   Docket 21 at 15 (Mot.).

[99]   Docket 2-3 at 10 ¶ 21 (4/8/13 Carlson Decl.).

[100]   Docket 2-3 at 6, 10 ¶¶ 12, 23; *see also* Docket 2-10 (Attachment G to Carlson Decl.: 11/4/09 Agenda) (describing various task orders).

[101]   Docket 2-3 at 6 ¶ 12.

[102]   *Id.* at 10 ¶ 21.

assessments, comparing the environmental impact of OCSP with alternative technologies.[103] ICRC's assessments, including an environmental assessment ("EA"), were subject to review, comment, and modification by MarAd and the Port.[104] After reviewing these assessments, MarAd and the Port approved the OCSP design as the "preferred alternative," noting that the EA "ha[d] been independently evaluated by the MARAD/POA," which took "full responsibility for [its] accuracy, scope, and content[.]"[105] Once MarAd approved the OCSP design, ICRC could not unilaterally change the specifications without MarAd's written approval.[106]

As further evidence of MarAd's involvement in developing and approving specifications, Carlson describes the regular communications between MarAd and ICRC. She asserts that representatives of MarAd and ICRC communicated on a daily basis,[107] that MarAd maintained a representative physically located in ICRC's Anchorage office "to supervise, review, and approve ICRC's execution of its contract responsibilities,"[108] and that MarAd engineers, environmental staff, and construction experts were also "frequently" on site to deal with Project issues.[109]

---

[103] *Id.* at 10 ¶ 23.

[104] Docket 2-3 at 10 ¶ 23 (4/8/13 Carlson Decl.).

[105] *Id.* at 10-11 ¶¶ 22-23; Docket 2-16 at 3 (Attachment M to Carlson Decl.: MarAd Finding of No Significant Impact).

[106] Docket 2-3 at 10, 12 ¶¶ 22, 25 ( "only MARAD had the authority to modify the contract and update the Project specifications").

[107] *Id.* at 7 ¶ 15.

[108] *Id.* at 7 ¶¶ 14, 18.

[109] *Id.* at 7 ¶ 16.

Pursuant to Carlson's declarations, and viewing the facts in the light most favorable to ICRC, it has plausibly demonstrated that MarAd did not "rubber stamp" ICRC's proposed task orders, but rather that there was a regular dialogue between MarAd and ICRC which included MarAd's approval of reasonably precise specifications. Thus, MarAd has plausibly satisfied the first requirement of the government contractor defense for purposes of federal officer removal jurisdiction.

**B.  The Project Conformed with the Government Specifications.**

The second element of the government contractor defense requires the contractor to demonstrate that the project conformed with the approved specifications.[110]  "The operative test for conformity with reasonably precise specifications turns on whether 'the alleged defect . . . exist[ed] independently of the design itself.'"[111]

MOA does not specifically address this element, but its failure to do so is understandable—because MOA argues that there were no government approved specifications, it could not separately argue that ICRC failed to comply with them. Rather, MOA asserts that "construction of the Project was controlled by ICRC."[112] ICRC, on the other hand, asserts that the Project conformed with the government's specifications, explaining that "MARAD accepted Project work as conforming to the detailed specifications through email and memoranda . . . ."[113]  For example, as

---

[110]  *Getz*, 654 F.3d at 864 (internal citations and quotation marks omitted).

[111]  *Id.*

[112]  Docket 21 at 15 (Mot.).

[113]  Docket 2 at 16 (Notice of Joint Removal by ICRC and PND).

discussed above, ICRC maintains that it conducted work on the Project pursuant to task orders, and that MarAd "indicated acceptance of Project work when it closed out contract task orders,"[114] or when it approved and executed Certificates of Completion for fulfilled task orders.[115] Viewing the facts in the light most favorable to ICRC for purposes of the present motion, ICRC has made a plausible showing that it conformed with the government specifications for the Project.

### C. The Contractor Warned of Dangers and Risks Known to the Contractor but not the United States.

To satisfy the third element—that the contractor warned the United States about dangers that were known to the contractor but not to the United States—the contractor must show that it warned "the government of dangers about which it ha[d] actual knowledge."[116]

MOA asserts that "ICRC cannot identify any facts to demonstrate that it warned MarAd or MOA about the dangers in using the OCSP design."[117] Instead, MOA asserts that, "[t]hrough its consultants and sub-consultants, ICRC concluded and validated that the OCSP design would 'be able to withstand seismic events' . . . and that the OCSP design was appropriate for the Project."[118]

ICRC, on the other hand, asserts that MarAd and the Port were "intimately aware" of the issues and challenges that arose with the OCSP design because of the

---

[114] Docket 2-3 at 7-8 ¶ 19 (4/8/13 Carlson Decl.).

[115] *See id.* at 7 ¶ 18.

[116] *Getz*, 654 F.3d at 865.

[117] Docket 21 at 16 (Mot.).

[118] *Id.*

regular communication with ICRC.[119]  Carlson further asserts that "[w]hen ICRC learned of new issues . . ., it promptly communicated the same to MARAD and the Port."[120]

Carlson describes two examples in which ICRC raised concerns about the OCSP technology to the government.  First, as discussed *supra* in Discussion Section II ("causal nexus"), during the RFP process, ICRC notified the Port and MarAd that several contractors sought to propose alternatives to the OCSP design.[121]  But Carlson asserts that MarAd determined that it would not permit proposals that included "similar" but alternative technology to the OCSP design.[122]  Second, Carlson asserts that ICRC provided a warning to MarAd through the 2004 Terracon Global Stability Report (the "Terracon Report"), which noted that the Pile-Supported Deck concept (an alternative technology to OCSP) "has a primary benefit over the OCSP concept with respect to global and structural stability."[123]  That Terracon Report recommended that "[a] test section of the OCSP structures should be constructed early in the first phase of port construction" to "provide a field trial . . . ."[124]  That advice was not followed.[125]  MOA disputes that Terracon Report was an adequate warning because "Terracon prepared several reports after the 2004 report," that those later reports "stated that the OCSP

---

[119]  Docket 2-3 at 14-15 ¶¶ 33-34 (4/8/13 Carlson Decl.).

[120]  *Id.*

[121]  Docket 30-1 at 5 ¶¶ 10-11 (5/28/13 Supp. Carlson Decl.); *see also* Docket 2-7 (Attachment N to Carlson Decl.: 12/21/06 Addendum 3 to RFP).

[122]  Docket 30-1 at 5 ¶¶ 10-11.

[123]  Docket 30-7 at 7 (Terracon Global Stability Report).

[124]  *Id.*

[125]  Docket 30-1 at 4 ¶ 8.

system was suitable for use at the Project," and that ICRC never specifically "highlighted or echoed this concern to MarAd."[126]

The Terracon Report, standing alone, may well not constitute an adequate warning for purposes of demonstrating a plausible government contractor defense. Likewise, ICRC's communications to MarAd about prospective contractors inquiring as to design alternatives may not constitute an adequate warning for purposes of the government contractor defense. But viewing these facts together in the light most favorable to ICRC for purposes of this jurisdictional motion, ICRC has plausibly demonstrated that it warned MarAd of dangers and risks that were known to ICRC.

Accordingly, ICRC has demonstrated that removal of this action to federal court under 28 U.SC. § 1442(a)(1), the federal officer removal statute, was proper. In so ruling, the Court finds only that the government contractor defense is colorable or plausible for purposes of subject matter jurisdiction.

## CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that:

1. Plaintiff's Motion to Remand at Docket 21 is **DENIED.**

2. Defendant ICRC's Motion to Supplement at Docket 55 is **DENIED.**

3. Plaintiff's Motion to Strike at Docket 65 is **DENIED.**

DATED at Anchorage, Alaska this 21st day of November, 2013.

/s/ Sharon L. Gleason
UNITED STATES DISTRICT JUDGE

---

[126] Docket 21 at 16 (Mot.); Docket 34 at 11 (Reply).