# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ALASKA

ANCHORAGE, A Municipal Corporation,

                  Plaintiff,

      v.

INTEGRATED CONCEPTS AND
RESEARCH CORPORATION; PND
ENGINEERS, INC.; and CH2M HILL
ALASKA, INC.,

                Defendants.

Case No. 3:13-cv-00063-SLG

## ORDER DENYING MOTION TO DISMISS

Before the Court at Docket 12 is a motion to dismiss filed by Defendant Integrated Concepts and Research Corporation ("ICRC") on April 17, 2013. At Docket 14, Defendant PND Engineers, Inc. ("PND") joined the motion. Plaintiff Municipality of Anchorage ("MOA") opposed the motion, and ICRC timely replied.[1] On January 6, 2014, a few days before oral argument was scheduled, at Docket 70, Defendant CH2M Hill Alaska, Inc. (formerly known as VECO Alaska, Inc., and referred to within this Order as "VECO") also joined ICRC's motion to dismiss. Oral argument was held on January 9, 2014.[2] Shortly after, on January 15, 2014, MOA opposed VECO's joinder to the motion to dismiss, and VECO replied.[3] For the following reasons, the Court will deny the motion to dismiss.

---

[1] Docket 37 (Opp'n); Docket 45 (Reply).

[2] Docket 72 (Minute Entry); Docket 75 (Transcript).

[3] Docket 73 (Opp'n VECO Joinder); Docket 74 (Reply VECO Joinder).

## FACTUAL BACKGROUND

The Complaint makes the following factual allegations:

The Port of Anchorage Intermodal Expansion Project (the "Project") was envisioned to be a multi-year infrastructure project that would replace deteriorated and outdated facilities, expand the Port's capacity, and increase the Port's ability to serve MOA, as well as the State of Alaska and U.S. military.[4] The Project was intended to be designed to account for the seismic risk posed by the Project's location in Anchorage, Alaska.[5]

In or about March 2003, MOA signed a Memorandum of Understanding ("MOU") with the Maritime Administration, a federal agency within the United States Department of Transportation ("MarAd"), that delineated MOA and MarAd's responsibilities with respect to the Project's funding and administration.[6] MOA, as the Project owner, was to focus on programmatic needs.[7] MarAd was to provide specialized technical expertise, including the Project's design and construction.[8]

In May 2003, MarAd first contracted with Koniag Services Inc., and by novation in 2004 with ICRC (the "2003 Contract"), for ICRC to "among other things, provide program management, design-build and related procurement services" for the Project's

---

[4] Docket 2-2 at 9 ¶ 11 (Compl.).

[5] Docket 2-2 at 9 ¶¶ 12-13 (Compl.).

[6] Docket 2-2 at 9 ¶ 14 (Compl.).

[7] Docket 2-2 at 10 ¶ 17 (Compl.); Docket 2-12 at 5 (MOU).

[8] Docket 2-2 at 10 ¶ 15 (Compl.).

administration, design, and construction.[9]  The 2003 Contract included a Statement of Work, which described in broad terms ICRC's Project responsibilities, which included design responsibilities, as well as construction, management, and oversight responsibilities.[10]  The Complaint alleges that "MOA relied upon MarAd to contract with, and oversee, ICRC's administration of the overall Project."[11]  The Complaint also alleges that "[t]he 2003 Contract . . . made ICRC liable for all damages to persons or property occurring as a result of ICRC's fault or negligence."[12]

ICRC subcontracted with PND to assist in preparing "a bid-ready project design assembly for the North Waterfront project, preliminary engineering services, and separate bid-ready project design assemblies for follow-on construction projects."[13]  The subcontract noted that PND's proprietary Open-Cell-Sheet-Pile Structure ("OCSP") had been selected for the Project.[14]  PND subcontracted with VECO for technical support and technical reviews.[15]  The Complaint alleges that "MOA relied upon ICRC (and its

---

[9]  Docket 2-2 at 10-11 ¶ 19 (Compl.); Docket 2-8 (2003 Contract).

[10]  Docket 2-2 at 11-12 ¶¶ 20-21 (Compl.).

[11]  Docket 2-2 at 10 ¶ 15 (Compl.).

[12]  Docket 2-2 at 12 ¶ 22 (Compl.).  The Complaint includes a similar allegation with respect to the 2008 Contract, discussed *infra*.  *See* Docket 2-2 at 16 ¶ 39 ("Like its 2003 counterpart, the 2008 MarAd-ICRC Contract made ICRC liable for all damages to persons or property occurring as a result of ICRC's fault or negligence.").

[13]  Docket 2-2 at 14 ¶¶ 28-29 (Compl.).

[14]  Docket 2-2 at 14 ¶ 31 (Compl.).

[15]  Docket 2-2 at 15 ¶¶ 35-37(Compl.).

consultants and their sub-consultants) for . . . analysis and validation of the OCSP design recommended by ICRC."[16]

In July 2008, MarAd awarded another contract to ICRC (the "2008 Contract") to continue performance of program management and design-build related to the Project.[17] The 2008 Contract expressly states that MOA and the Port are third-party beneficiaries to the contract.[18]

The Complaint contains detailed assertions that the work performed by ICRC, PND, and other subcontractors was plagued with a variety of problems.[19] Some of these problems are summarized in a "Suitability Study," issued in February 2013 by CH2M Hill, Alaska, Inc., which had been engaged by the United States Army Corps of Engineers through agreement with MarAd.[20] The Suitability Study "detail[ed] various deficiencies in the Project's administration, design, and construction" that the Complaint alleges are attributable to the Defendants.[21] MOA alleges that as of the time it filed its lawsuit, "the Project work [wa]s . . . on hold," and that "the completion date for the Project ha[d] been significantly pushed back."[22]

---

[16] Docket 2-2 at 26 ¶ 88 (Compl.).

[17] Docket 2-2 at 15-16 ¶ 38 (Compl.).

[18] Docket 2-2 at 16-17 ¶ 40 (Compl.); Docket 2-9 at 7 (2008 Contract).

[19] Docket 2-2 at 28-44 ¶¶ 98-189 (Compl.).

[20] Docket 2-2 at 45-47 ¶¶ 200-204 (Compl.).

[21] Docket 2-2 at 47 ¶ 204 (Compl.).

[22] Docket 2-2 at 45 ¶¶ 198-99 (Compl.).

MOA's Complaint asserts six causes of action: (1) breach of contract by ICRC; (2) professional negligence by ICRC; (3) negligence by ICRC; (4) professional negligence by PND; (5) negligence by PND; and (6) professional negligence by VECO.[23] ICRC moves to dismiss this action on three alternative bases: (1) pursuant to Federal Rule of Civil Procedure 12(b)(1), asserting that ICRC is protected by derivative sovereign immunity; (2) with respect to the breach of contract claim, pursuant to Federal Rule of Civil Procedure 12(b)(6), asserting that MOA has failed to state a claim upon which relief can be granted because MOA was not an intended third-party beneficiary to the 2003 and 2008 Contracts between MarAd and ICRC; and (3) pursuant to Federal Rule of Civil Procedure 12(b)(7), asserting that MOA failed to join the United States, which ICRC asserts is an indispensible party.[24] As noted above, Defendants PND and VECO joined ICRC's motion.[25]

## DISCUSSION

## I. ICRC's Motion to Dismiss Pursuant to Rule 12(b)(1): Derivative Sovereign Immunity.

ICRC asserts that the Court should dismiss this action under principles of derivative sovereign immunity because ICRC did not exceed the scope of authority validly conferred upon it through the MarAd contracts.[26] MOA disagrees, asserting that

---

[23] Docket 2-2 at 47-53 ¶¶ 205-236 (Compl.).

[24] Docket 12 (Mot.).

[25] *See* Docket 14 (PND Joinder); Docket 70 (VECO Joinder). This Order focuses on facts and legal analysis pertinent to ICRC. To the extent that ICRC's arguments are applicable to the other Defendants, the Court's reasoning would not differ.

[26] Docket 12 at 8-9 (Mot.).

ICRC's independent, negligent acts caused MOA's damages—not any directives from MarAd—and thus derivative sovereign immunity is inapplicable.[27]

## A. Review of a Rule 12(b)(1) Motion to Dismiss.[28]

Federal Rule of Civil Procedure 12(b)(1) allows a party to seek dismissal of a complaint for lack of subject-matter jurisdiction. Challenges to subject matter jurisdiction can take two forms, facial or factual. The parties here agree that ICRC is making a facial challenge.[29] In a facial challenge to subject matter jurisdiction, "the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction."[30] "Whether subject matter jurisdiction exists therefore does not depend on resolution of a factual dispute."[31] Rather, the allegations in the complaint are "assume[d] . . . to be true and [the court] draw[s] all reasonable inferences in [plaintiff's] favor."[32]

---

[27] Docket 37 at 13-14 (Opp'n).

[28] Although ICRC characterizes the portion of the motion to dismiss on grounds of sovereign immunity as a Rule 12(b)(1) motion, *see* Docket 12 at 1, 7-13 (Mot.), and MOA does not dispute this characterization, *see* Docket 37 at 4, 15-26 (Opp'n), the motion may be more appropriately considered under another portion of Rule 12. *See infra*, notes 52 and 77.

[29] Docket 12 at 7-8 and n.2 (Mot.); Docket 37 at 16 (Opp'n).

[30] *Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004) (quoting *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004)).

[31] *Wolfe*, 392 F.3d at 362.

[32] *Id.* at 362 (citing Fed. R. Civ. P. 12(b)(1) and cases); *see also Doe v. Schachter*, 804 F.Supp. 53, 56-57 (N.D. Cal. 1992) ("Where there is a facial attack on the court's subject matter jurisdiction . . . the plaintiff enjoys safeguards akin to those applied when a Rule 12(b)(6) motion is made." (internal citation omitted)).

## B. Discussion.

The Complaint makes a number of allegations to support MOA's assertion that ICRC breached its 2003 and 2008 Contracts with MarAd, and that ICRC, PND, and VECO acted negligently:

- The Complaint alleges that the 2003 and 2008 Contracts required ICRC "to provide a constructability review of various design documents," including PND's OCSP design, and asserted that "[u]pon information and belief . . . neither ICRC nor PND performed a constructability review," and if it was performed, "it was clearly performed in a negligent manner."[33]

- The Complaint describes various problems with the Project (e.g., problems with armor rock, dredging, dike construction, driving the piles, wye piles), and asserts that "[m]any issues that impacted the Project work are indicative of the lack of Project oversight, quality control, and quality assurance methods in place on the Project; issues for which ICRC and PND were responsible."[34]

- The Complaint alleges that ICRC and PND should have been aware of certain problems with the Project in 2008, but failed to take investigative action until 2010.[35]

- MOA alleges that ICRC acted negligently in "administering, designing, and constructing the Project . . . and otherwise failing to perform its duties with the requisite degree of care that a reasonably prudent, skilled, and qualified professional would exercise under the circumstances."[36] The Complaint provides examples of the alleged negligent conduct. For instance, MOA asserts that ICRC reviewed PND's OCSP design and ultimately recommended the selection of that design for the Project;[37] and that "ICRC put PND in charge of supervising, directing, and inspecting the OCSP work,"

---

[33] Docket 2-2 at 17, 32 ¶¶ 42-43, 124 (Compl.).

[34] Docket 2-2 at 29-33 ¶¶ 99-104 (armor rock), 105-106 (dredging), 110-118 (dike construction), 118-123 (driving piles), 127-130 (wye piles), 131.

[35] Docket 2-2 at 35 ¶ 141 (Compl.).

[36] Docket 2-2 at 48, 49 ¶¶ 214, 219 (Compl.).

[37] Docket 2-2 at 17-18, 24, 26 ¶¶ 44-45, 77-78, 84 (Compl.).

but that PND "was unwilling to admit or acknowledge that there were problems with PND's [OCSP] design and its prescriptive requirements."[38]

- MOA alleges that PND acted negligently in "designing and administering the construction of the Project."[39]  For example, the Complaint alleges that PND provided a report stating that OCSP was appropriate for the Project.[40]  But as noted above, the Complaint details various problems with OCSP.

- MOA alleges that VECO acted negligently in "performing its design services . . . and otherwise failing to perform its duties with the requisite degree of care that a reasonably prudent, skilled, and qualified professional would exercise under the circumstances."[41]  For example, the Complaint asserts that VECO provided a stability analysis report that concluded that the PND OCSP system was suitable for use at the Project site.[42]

ICRC has asserted that irrespective of these allegations, the Complaint does not specifically allege that ICRC exceeded the authority that had been conferred on it by the federal government under the 2003 and 2008 Contracts.[43]  ICRC further asserts that derivative sovereign immunity should apply to preclude MOA's suit against ICRC because, despite MOA's listing of various concerns with the Project, "there is no suggestion in the complaint that MARAD ever rejected ICRC's contract work or otherwise asserted that ICRC failed to perform in compliance with its contractual requirements."[44]  Instead, ICRC notes that the Complaint itself maintains that ICRC was

---

[38]  Docket 2-2 at 18 ¶ 47 (Compl.).

[39]  Docket 2-2 at 50, 51 ¶¶ 224, 229 (Compl.).

[40]  Docket 2-2 at 26 ¶¶ 85-86 (Compl.).

[41]  Docket 2-2 at 52 ¶ 234 (Compl.).

[42]  Docket 2-2 at 25-26 ¶¶ 80-83 (Compl.).

[43]  *See* Docket 12 at 8-9 (Mot.); Docket 75 at 5-6, 28, 29-30 (Transcript).

[44]  Docket 12 at 6-7 (Mot.).

acting only at the direction of MarAd and cites to portions of the Complaint, including the following allegations:

- "MOA relied upon MarAd to contract with, and oversee, ICRC's administration of the overall Project."[45]

- ICRC "sought and received MarAd's approval to engage PND for the oversight role."[46]

The parties each cite to numerous cases that discuss derivative sovereign immunity and its exceptions. ICRC's motion cites primarily *Yearsley v. W.A. Ross Construction Co.*, a 1940 Supreme Court decision; *Ackerson v. Bean Dredging LLC*, a 2009 Fifth Circuit decision; *Gomez v. Campbell-Ewald Company*, an unreported 2013 decision from the Central District of California; and *Filarsky v. Delia*, a recent Supreme Court decision considering qualified immunity in a 42 U.S.C. § 1983 case.[47] MOA's opposition distinguishes the cases relied upon by ICRC, and cites to other cases, including *Cabalce v. VSE Corporation*, a 2013 decision from the District Court for the District of Hawaii and *In re Fort Totten Metrorail Cases* (*"Fort Totten"*), a 2012 decision from the District Court for the District of Columbia.[48] While each of these cases is instructive, none is directly on point.

---

[45] Docket 2-2 at 10 ¶ 15 (Compl.) (as discussed in Docket 12 at 6 (Mot.)); *see also* Docket 75 at 9 (Transcript).

[46] Docket 2-2 at 17-18 ¶ 45 (Compl.) (as discussed in Docket 12 at 6 (Mot.)).

[47] *See* Docket 12 at 8-12 (Mot.) (discussing *Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18 (1940); *Ackerson v. Bean Dredging LLC*, 589 F.3d 196 (5th Cir. 2009); *Gomez v. Campbell-Ewald Co.*, No. CV 10-02007, 2013 WL 655237 (C.D. Cal. Feb. 22, 2013); *Filarsky v. Delia*, 132 S.Ct. 1657 (2012)).

[48] *See* Docket 37 at 18-25 (Opp'n) (discussing *Cabalce v. VSE Corp.*, 922 F.Supp.2d 1113 (D. Hawaii 2013), *appeal docketed*, No. 13-15256 (9th Cir. Feb. 11, 2013); *Fort Totten*, 895 F.Supp.2d 48, 73 (D.D.C. 2012)).

In *Yearsley*, the Supreme Court considered whether a private contractor that was building river dikes at the direction of the United States Army Corps of Engineers could be held liable for a "taking" of plaintiff landowners' land when the dikes caused erosion to the plaintiffs' property. After reviewing the evidence in the record, the Court concluded that it was "undisputed that the work which the contractor had done in the river bed was all authorized and directed by the Government of the United States."[49] As such, the Court determined that the private contractor could not be held liable because "if this authority to carry out the project was validly conferred, that is, if what was done was within the constitutional power of Congress, there is no liability on the part of the contractor for executing its will."[50] And yet the Supreme Court in *Yearsley* specifically left open the possibility that the private landowners could obtain compensation from the government had there been an unconstitutional taking without just compensation.[51] Thus, this Court does not construe *Yearsley* to involve derivative sovereign immunity.[52] Rather, it is a case that accords protection from suit to a private contractor when it is acting solely at the government's authority and direction, while expressly recognizing the potential liability of the government itself.[53]

---

[49] *Yearsley*, 309 U.S. at 20 (internal quotation omitted).

[50] *Id.* at 20-21.

[51] *Id.* at 21.

[52] *Cf. Ackerson*, 589 F.3d at 207 (in context of determining that a *Yearsley* defense would not be jurisdictional in nature, noting that *Yearsley* "does not discuss sovereign immunity").

[53] Indeed, *Yearsley* could be read as simply acknowledging a basic rule of agency: "[T]here is no ground for holding [the government] agent liable who is simply acting under . . . authority . . . validly conferred. The action of the agent is 'the act of the government.'" In *Yearsley*, the Supreme Court also noted that this principle had been applied in the patent context, explaining that "the statute providing compensation for the use by the Government of patented inventions

In *Ackerson*, the Army Corps of Engineers contracted with defendant contractors to dredge the Mississippi River. Local residents, whose property was damaged in a hurricane, later sued the private contractors, alleging that the dredging had caused damage, which amplified the hurricane's storm surge. The Fifth Circuit affirmed a Rule 12(b)(1) and 12(c) dismissal with prejudice of claims against the defendant contractors on the basis of "government-contractor immunity," concluding the "complaints le[ft] no doubt that the Contractor Defendants were executing Congress's will in dredging" the river.[54] And while the plaintiffs did claim negligence, that claim focused on the government's policy to undertake the dredging and "not any separate act of negligence by the Contractor Defendants."[55] Here, in contrast, MOA is not asserting that ICRC was simply executing MarAd's policy with respect to the OCSP design and other acts. Instead, MOA asserts that it was the Defendants' specific acts (or failures to act) that caused the alleged harms.[56]

---

without license of the owner" would "relieve the contractor from liability of every kind 'for the infringement of patents in manufacturing anything for the government,'" while at the same time insuring "complete compensation by the Government." *Id.* at 21-22. *But see Ackerson*, 589 F.3d at 204 (The Fifth Circuit has "never held that *Yearsley* requires a common-law agency relationship between the government and a contractor."). *See also In re Hanford Nuclear Reserv. Litig.*, 534 F.3d 986, 1000 (9th Cir. 2007) (The *Yearsley* "Court limited the applicability of the defense to principal-agent relationships where the agent had no discretion in the design process and completely followed government specifications.").

[54] *Ackerson*, 589 F.3d at 207.

[55] *Id.*; *see also id.* at 209 ("[T]he factual allegations in the remainder of the original complaint go to the alleged damage from the existence and state of the [river], not the Contractor Defendants' activities in maintaining it.").

[56] *See, e.g.,* Docket 2-2 at 12-13, 17-18, 24-26, 29-33, 35, 48-52 ¶¶ 24, 42-45, 47, 77-78, 80, 83-86, 99-106, 110-124, 127-131, 141, 214, 219, 224, 229, 234 (Compl.).

In *Gomez*, the District Court for the Central District of California granted a government contractor's motion for summary judgment, concluding that the contractor, an advertising agency, was entitled to derivative sovereign immunity in a lawsuit in which the plaintiff alleged a violation of the Telephone Consumer Protection Act (TCPA) in connection with text messages sent as part of military recruitment efforts.[57] The court first noted that the United States was immune from liability for violations of the TCPA.[58] The court then held that the immunity should extend to the private contractor, as the plaintiff "point[ed] to no evidence indicating that [the contractor] exceeded the scope of its authority to send the text message at issue."[59] Rather, the court noted that the contractor had presented "uncontroverted evidence" that the government "worked closely" with the defendant contractor on the text message recruitment campaign.[60] In contrast to *Gomez*, here, MOA's Complaint infers that MarAd played a less active role, and that it was the Defendants, not the government, that were responsible for the design and construction problems that arose.[61]

ICRC also cites to the Supreme Court decision in *Filarsky v. Delia*.[62] In that case, Filarsky, a private lawyer with experience conducting internal affairs

---

[57] *Gomez*, 2013 WL 655237, at *4.

[58] *Id.*

[59] *Id.* at *5.

[60] *Id.* at *6.

[61] *See, e.g.,* Docket 2-2 at 10 ¶ 17 (Compl.) (MarAd charged with "technical aspects, the ultimate design and construction of the Project, [and] administration of the design and construction," for which it contracted with ICRC); *see also* Docket 2-2 at 11-12, 33, 46-47 ¶¶ 20, 21, 131, 204 (Comp.).

[62] *Filarsky v. Delia*, 132 S.Ct. 1657 (2012).

investigations, was temporarily retained by a city government to investigate a city employee. Filarsky worked "in close coordination with public employees" in conducting the investigation.[63] The city employee sued Filarsky for civil rights violations under 42 U.S.C. § 1983. Filarsky moved for summary judgment, asserting that he was entitled to qualified immunity. The Supreme Court held that Filarsky could invoke qualified immunity, first explaining there was "no dispute that qualified immunity [wa]s available for the sort of investigative activity at issue."[64] The Court then reasoned that there was no basis not to accord that qualified immunity to a person whom the government retained to conduct its work on a temporary basis, when that immunity was available to permanent government employees.[65]

ICRC directs the Court to the following statement in *Filarsky* concerning the policy underlying immunity:

> [I]mmunity protects government's ability to perform its traditional functions . . . by helping to avoid unwarranted timidity in performance of public duties, ensuring that talented candidates are not deterred from public service, and preventing the harmful distractions from carrying out the work of government that can often accompany damages suits.[66]

But in *Filarsky*, the Supreme Court was considering the extension of qualified immunity to a temporary government worker in a section 1983 action, who was working "in close coordination" with permanent employees. This Court is not persuaded that *Filarsky* and

---

[63] *Id.* at 1666.

[64] *Id.* at 1662.

[65] *Id.* at 1667-68.

[66] Docket 12 at 11 (Mot.) (quoting *Filarsky*, 132 S.Ct. at 1665 (internal citations, quotations, and alterations omitted)).

the policy it recognizes are helpful in determining the applicability of derivative sovereign immunity to a government contractor that is alleged to have negligently performed acts that are separate from the government's role in a construction project.

In its opposition to the motion to dismiss, MOA cites *Cabalce v. VSE Corporation*.[67]    In *Cabalce*, several employees of the defendant government subcontractor were killed when handling a cache of government-seized fireworks.  The plaintiffs initially sued in state court.  The defendant then removed the case to federal court.  The plaintiffs moved to remand, and the defendant asserted federal jurisdiction under the federal officer removal statute, which requires a defendant to demonstrate a colorable federal defense.   In that context, the defendant attempted to assert a colorable defense of derivative sovereign immunity.[68]

---

[67]  Docket 37 at 19-20, 24-25 (Opp'n) (discussing *Cabalce*, 922 F.Supp.2d 1113).  MOA also cites *Myers v. United States*, 323 F.2d 580, 581 (9th Cir. 1963) and *Merritt, Chapman & Scott Corp. v. Guy F. Atkinson Co.*, 295 F.2d 14 (9th Cir. 1961).  *See* Docket 37 at 19, 21-22, 25 (Opp'n).  *Myers* concluded, after a trial, that a government contractor could not be liable for "work performed . . . under its contract with the Bureau of Public Lands, and in conformity with the terms of said contract."  *Myers,* 323 F.2d at 584 (citing *Yearsley*, 309 U.S. 18).  *Myers* is not particularly instructive with respect to the motion to dismiss before this Court because it was decided on a complete trial record.  *Merritt* similarly evaluated a "government contract defense" after trial, rather than derivative sovereign immunity on a motion to dismiss.  *Merritt*, 295 F.2d at 16.  In *Merritt*, the court declined to extend a government contract defense to a contractor that was alleged to have acted negligently.  *Id.*  (nothing in the contract nor circumstances "convince[d the court] that [the contractors] were required by any government directive or authority to do that which was charged against them as negligent acts").  *Merritt*'s government contract defense analysis pre-dates *Boyle*, the leading case on that defense.  Various courts have recognized the interplay between the two defenses, but many courts find the distinction imprecise.  *See, e.g., Cabalce*, 922 F.Supp.2d at 1123 (compiling cases and stating "[s]pecifically, it is unclear whether a 'derivative sovereign immunity defense' (or a 'shared immunity defense') derived from *Yearsley* is truly distinct from a 'government contractor defense' derived from *Boyle*.").

[68]  *Cabalce*, 922 F.Supp.2d at 1125; *see also* Docket 67 at 10-11 (Order on Motion to Remand and Related Motions) (discussing *Cabalce*).

The District Court for the District of Hawaii analyzed the claim under *Yearsley* and its progeny.[69]  The court cited *Fort Totten* and concluded that government contractor immunity is subject to two limitations: (1) the *Yearsley* doctrine may apply only if "the contractor was following the sovereign's directives"; and (2) "derivative sovereign immunity is not available to contractors who act negligently in performing their obligations under the contract."[70]  With those limitations in mind, the court concluded that the defendant could not demonstrate a colorable defense of derivative sovereign immunity because the defendant "was not simply 'following the sovereign's directives,'" but was an independent contractor that "developed and implemented the fireworks destruction plan (albeit with government approval.)."[71]  The court further found that defendant lacked a colorable claim for derivative sovereign immunity because the defendant "was allowed to exercise discretion in determining how the task should be accomplished," and that any harm could be traced to the "contractor's independent decision to perform the task in an unsafe manner."[72]

*Cabalce* provides a well-reasoned, thoughtful analysis of precedent from various jurisdictions.[73]  But this Court is tasked with answering a different question than the one before the *Cabalce* court: In *Cabalce*, the court was asked to determine whether, based

---

[69]  *Cabalce*, 922 F.Supp.2d at 1125.

[70]  *Id.* at 1125 (discussing *Fort Totten*, 895 F.Supp.2d  at 73); *see also Hanford*, 534 F.3d at 1000 (discussing government contractor defense, but noting "*Yearsley* [did not] extend[] immunity to military contractors exercising a discretionary governmental function").

[71]  *Id.* at 1126.

[72]  *Id.* at 1127 (internal quotations omitted).

[73]  *Cabalce* is currently on appeal before the Ninth Circuit.  *See Cabalce*, 922 F.Supp.2d 1113, *appeal docketed*, No. 13-15256 (9th Cir. Feb. 11, 2013).

upon the record, the defendant had asserted a colorable defense of derivative sovereign immunity for purposes of federal jurisdiction; otherwise, the case would be remanded to state court. In contrast, here, the Court is asked to determine whether, drawing all inferences from the Complaint in MOA's favor, the allegations conclusively demonstrate that ICRC is entitled to derivative sovereign immunity and dismissal of the action.

ICRC asserts that dismissal on this basis is warranted, largely because the Complaint does not specifically allege that ICRC exceeded its authority under its contracts with MarAd.[74] But to dismiss for failure to allege those precise words would elevate form over substance.[75] And although several allegations in the Complaint suggest that MarAd exercised some oversight over ICRC, other allegations assert ICRC's independent discretion and negligence.[76] Thus, the Complaint does not, on its face, demonstrate ICRC's entitlement to dismissal of this action based on derivative sovereign immunity.[77]

---

[74] *See* Docket 12 at 8-9 (Mot.); Docket 75 at 5-6, 28, 29-30 (Transcript).

[75] Because MOA filed this litigation in state court, it arguably lacked notice that it must plead these allegations.

[76] *Compare* Docket 2-2 at 10, 17-18 ¶¶ 15, 45 *with* Docket 2-2 at 12-13, 17-18, 24-26, 29-33, 35, 48-52 ¶¶ 24, 42-45, 47, 77-78, 80, 83-86, 99-106, 110-124, 127-131, 141, 214, 219, 224, 229, 234.

[77] *Cf. Al Shimari v. CACI Int'l, Inc.*, 679 F.3d 205, 218 (4th Cir. 2012) (in concluding district court decisions denying federal contractor defendants' motions to dismiss on grounds of derivative sovereign immunity were not reviewable, noting that derivative sovereign immunity is more a defense to liability than a pure immunity from suit); *Contango Operators, Inc. v. United States*, -- F.Supp.2d --, 2013 WL 4459065, at *15 (S.D. Texas Aug. 15, 2013) (denying government contractor motion for summary judgment where defendant "[wa]s alleged to have acted negligently in performing the dredging activities, the subject of the government contract"); *Bixby v. KBR, Inc.*, 748 F.Supp.2d 1224 (D. Oregon 2010) (denying motion to dismiss for lack of subject matter jurisdiction based on defenses, including government contractor defense).

## II. ICRC's Motion to Dismiss Pursuant to Rule 12(b)(7): Rule 19.

ICRC alternatively asserts that this case should be dismissed pursuant to Federal Rule of Civil Procedure 19 because MarAd is a necessary party and cannot be joined in this forum.[78] ICRC maintains that MarAd is necessary because it was a party to the contracts between MOA and MarAd; because failure to join MarAd might result in unnecessary and repetitive litigation; and because the 2003 and 2008 Contracts are "cost-reimbursement contracts," which could require that MarAd reimburse ICRC for any legal costs incurred in defending this litigation.[79] MOA responds that MarAd is not a necessary party because: "1) ICRC has released any and all claims it has against MarAd, including claims for attorneys' fees and costs; 2) the terms of the 2003 Contract and 2008 Contract make ICRC liable for any damages caused due to ICRC's fault or negligence and ICRC cannot recover costs incurred to defend litigation arising from its breach of the contracts with MarAd; and 3) the negligence and professional negligence claims asserted against ICRC are unrelated to the 2003 Contract and 2008 Contracts, and MarAd has no obligation to indemnify ICRC for ICRC's own negligence."[80]

---

[78] Rule 19 was revised in 2007, and"[t]he Rules Committee advised the changes were stylistic only . . . . [T]he word 'required' replaced the word 'necessary' in [Rule 19](a)." *Philippines v. Pimentel*, 553 U.S. 851, 855 (2008). The terms "required" and "necessary" are used interchangeably in this Order.

[79] Docket 12 at 13-23 (Mot.).

[80] Docket 37 at 31 (Opp'n).

## A.  Review of a Rule 12(b)(7) Motion to Dismiss.

Federal Rule of Civil Procedure 19 requires that a court conduct a three-step analysis to determine whether joinder of an absent person is required.[81]  First, a court evaluates whether the absent person is required or necessary to the action.  A person may be necessary in three different ways: (1) under Rule 19(a)(1)(A), if "in that person's absence, the court cannot accord complete relief among [the] existing parties"; or (2) under Rule 19(a)(1)(B)(i), if that person claims an interest in the action and a decision issued in its absence may "impair or impede [its] ability to protect the interest"; or (3) under  Rule 19(a)(1)(B)(ii), if that person claims an interest in the action and a decision issued in its absence may "leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations."[82]  If the party is found to be necessary, the court next determines whether joinder is feasible.[83]  Finally, if joinder is not feasible, the court evaluates whether "equity and good conscience" require that the litigation proceed among the existing parties.[84]  In determining whether equity and good conscience require that the litigation proceed, the court considers the four Rule 19(b) factors.[85]  A Rule 19 inquiry is "a practical one and fact specific."[86]  On a

---

[81]  *Salt River Project Agric. Improvement & Power Dist. v. Lee*, 672 F.3d 1176, 1179 (9th Cir. 2012); *see also Dawavendewa v. Salt River Project Agric. Improvement & Power Dist.*, 276 F.3d 1150, 1154-55 (9th Cir. 2002).

[82]  Fed. R. Civ. P. 19; *Lee*, 672 F.3d at 1179.

[83]  *Lee*, 672 F.3d at 1179.

[84]  Fed. R. Civ. P. 19(b); *see also Lee*, 672 F.3d at 1179.

[85]  Fed. R. Civ. P. 19(b).  The four factors are: "(1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties; (2) the extent to which

Rule 12(b)(7) motion to dismiss for failure to join an indispensible party, "[t]he moving party has the burden of persuasion in arguing for dismissal."[87]   The court "accept[s] as true the allegations in [p]laintiff's complaint and draw[s] all reasonable inferences in [p]laintiff's favor.[88]

## B. Discussion.

The Court turns to the three-part Rule 19 analysis.

### 1. MarAd is Not Required under Rule 19(a)(1)(A).

Pursuant to Rule 19(a)(1)(A), a party is required if "in that person's absence, the court cannot accord complete relief among existing parties."   Relief is "complete" where it is "meaningful relief *as between the parties*."[89]   Here, the parties' arguments focus on whether MarAd might be required to reimburse ICRC for litigation costs associated with this action.   ICRC appears to argue that because MarAd might be obligated to reimburse ICRC for legal costs, the Court cannot accord complete relief with respect to ICRC without MarAd's presence.[90]   MOA responds that through the September 28, 2012 Negotiated Contract Adjustment Agreement between ICRC and MarAd (the

---

any prejudice could be lessened or avoided . . . ; (3) whether a judgment rendered in the person's absence would be adequate; and (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder."

[86]  *Makah Indian Tribe v. Verity*, 910 F.2d 555, 558 (9th Cir.1990).

[87]  *Id.* (citing *Sierra Club v. Watt*, 608 F. Supp. 305, 312 (E.D. Cal. 1985)).

[88]  *Paiute-Shoshone Indians of the Bishop Cmty. v. Los Angeles*, 637 F.3d 993, 996 n.1 (9th Cir. 2011).

[89]  *Alto v. Black*, 738 F.3d 1111, 1126 (9th Cir. 2013) (quoting *Disabled Rights Action Comm. v. Las Vegas Events, Inc.*, 375 F.3d 861, 879 (9th Cir. 2004) (emphasis in original)).

[90]  Docket 12 at 16-18 (Mot.); Docket 45 at 16 (Reply).

"Release"), "ICRC has released any and all claims it has against MarAd, including claims for attorneys' fees and costs."[91]  MOA further asserts that regardless of how the Release is interpreted, ICRC could not seek reimbursement for litigation costs to the extent that those costs arise from ICRC's alleged negligence, which MOA contends is "unrelated to the 2003 and 2008 Contracts."[92]  ICRC responds that MOA misinterprets the Release, and that regardless of the interpretation, ICRC could seek reimbursement on unrelated claims.[93]

The Court concludes that MarAd is not a required party because the Court can afford "complete relief" to the current parties, as between them, without MarAd's presence.[94]  The Court recognizes that the parties disagree concerning ICRC's rights to pursue reimbursement of litigation costs from MarAd.  The Court does not and need not resolve that dispute, at least at this juncture.[95]  Stated differently, ICRC has not demonstrated that the fact that ICRC asserts a potential right to recover its litigation costs from the government makes the government's presence required in this litigation.

---

[91]  Docket 37 at 31-32 (Opp'n).  ICRC does not dispute that the Court may take judicial notice of the existence of the Release.  Docket 45 at 3, n.1 (Reply).

[92]  Docket 37 at 31, 33, 35 (Opp'n).

[93]  Docket 45 at 16-17 (Reply); Docket 37-1 at 3 (9/28/12 Negotiated Contract Adjustment Agreement between ICRC and MarAd).  ICRC asserts the Release reserves the rights and liabilities of MarAd and ICRC with respect to "the final audit and close out of the Contracts unrelated in any way to the released claims . . . ."

[94]  *See Alto*, 738 F.3d at 1126.

[95]  In contrast to *Boeing N. Am., Inc. v. Roche*, discussed by the parties, the question of allowable legal costs is not before this Court.  298 F.3d 1274 (Fed. Cir. 2002) (discussing allowability of legal costs in shareholder derivative lawsuit).

Case law supports the conclusion that MarAd is not a necessary party in these circumstances.[96] For example, in *Hurley v. Horizon Project, Inc.*, the District Court for the District of Oregon evaluated whether the State of Oregon, an alleged joint tortfeasor, was a necessary party to the litigation. In analyzing whether joinder was required under Rule 19(a)(1)(A), the court concluded that "it is not necessary for all joint tortfeasors to be named as defendants in a single lawsuit."[97] Several cases analyzing Rule 19(b) (i.e., considering the four Rule 19(b) factors) have similarly concluded that contribution and indemnity are not legitimate reasons so as to require joinder. For instance, in *Gardiner v. Virgin Islands Water & Power Authority* ("WAPA"), the Third Circuit evaluated whether the United States was a necessary party in an action brought by a securities services provider against WAPA.[98] The Third Circuit did not specifically evaluate whether the United States was a necessary party under Rule 19(a)(1)(A), but concluded that the case could proceed without the United States under the Rule 19(b) equitable factors because "a defendant's right to contribution or indemnity from an absent non-diverse party does not render that absentee indispensible pursuant to Rule

---

[96] ICRC also asserts that MarAd is the "real party" because it bore "ultimate responsibility for making the decisions that form the bases of the Municipality's complaint." Docket 12 at 18 (Mot.) (discussing *Grasso v. U.S. Postal Service*, 438 F.Supp. 1231, 1235 (D. Conn. 1977)). The Court finds this argument unpersuasive because the *Grasso* court ultimately found that the United States was a necessary party because the named defendant had acted "only in the name of the United States." *Id.* In contrast, here, MOA's Complaint alleges that ICRC acted with discretion and negligently, i.e., not merely in the name of MarAd. Furthermore, if ICRC proceeds with this "real party" line of defense, ICRC would likely not be prejudiced by MarAd's absence. *Cf. Hurley v. Horizon Project Inc.*, No. 08-cv-1365-ST, 2009 WL 5511205, at *8 (D. Oregon Dec. 3, 2009) ("Because the State will not be present to defend itself, it is difficult to understand how its absence will prejudice the county defendants.").

[97] *Hurley*, 2009 WL 5511205, at *7 (quoting *Temple v. Synthes Corp.*, 498 U.S. 5, 7 (1990)).

[98] *Gardiner v. Virgin Islands Water & Power Auth.*, 145 F.3d 635, 640 (3d Cir. 1998).

19."[99]  The court found relevant that, although "a less convenient . . . remedy," WAPA could separately bring an action for indemnity against the United States.[100]  Although *Gardiner* was decided under Rule 19(b), it supports a conclusion that MarAd's potential financial interest does not render it indispensable.[101]

### 2. MarAd is Not Required under Rule 19(a)(1)(B).

Pursuant to Rule 19(a)(1)(B), a person is required if "that person claims an interest" in the litigation and proceeding without that person might impair the person's ability to protect that interest or leave another party subject to risk of substantial or inconsistent obligations.  MarAd is not a required party under Rule 19(a)(1)(B)(i) or (ii) because MarAd, which is aware of this litigation,[102] has not claimed an interest in the litigation.[103]

---

[99]  *Id.* at 641 (quoting *Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.*, 11F.3d 399, 412 (3d Cir. 1993)).

[100]  *Id.* at 642; *see also Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 829 (1989) (because absent party is jointly and severally liable with named parties does not mean absent party is indispensible); *Cachil Dehe Band of Wintun Indians v. California*, 547 F.3d 962, 971 (9th Cir. 2008) ("The mere fact that the outcome of Colusa's litigation may have some financial consequences for the non-party tribes is not sufficient to make those tribes required parties."); *Yates v. Delano Retail Partners, LLC*, No. C 10-3073, 2012 WL 1094444 (N.D. Cal. Mar. 29, 2012) ("possible existence of an indemnification agreement does not make [the indemnifying party] an indispensable party").

[101]  *Gardiner*, 145 F.3d at 641.  That MOA also asserts negligence claims against the Defendants that it maintains are independent of the MarAd contracts also supports a finding that MarAd is not a necessary party.

[102]  It appears that a representative from MarAd was present at the January 9, 2013 oral argument.  *See* Docket 75 at 15-16 (Transcript).

[103]  *Altmann v. Austria*, 317 F.3d 954, 971 (9th Cir. 2002) ("Where a party is aware of an action and chooses not to claim an interest, the district court does not err by holding that joinder was 'unnecessary.'"); *United States. v. Bowen*, 172 F.3d 682, 689 (9th Cir. 1999) ("Joinder is 'contingent . . . upon an initial requirement that the absent party *claim* a legally protected interest relating to the subject matter of the action.'" (quoting *Northrop Corp. v. McDonnell Douglas Corp.*, 705 F.2d 1030 (9th Cir. 1983)) (emphasis in original)).

### 3. Rule 19 Analysis—Steps (2) and (3).

Because the Court has concluded that MarAd is not required, the Court does not consider whether joinder is feasible nor whether equity and good conscience require permitting the matter to proceed.

### 4. MarAd's Joinder is Not Required Simply Because it is a Party to the Contracts.[104]

ICRC quotes *Hall v. Club Corporation of America* to support its argument that "[i]t goes without saying that parties to a contract are necessary ones."[105] But *Hall* is unreported, provides limited analysis, and the Court cannot rely upon it for this proposition.[106] The Court agrees with MOA that the additional cases that ICRC cites do not mandate the blanket categorization of parties to a contract as necessary parties. Rather, as discussed above, whether a party to a contract is a necessary party to the litigation requires "a practical . . . and fact specific" inquiry.[107]

For example, ICRC cites *American Greyhound Racing, Inc. v. Hull*.[108] In that case, racetrack owners and operators brought an action against the Governor of Arizona to challenge the legality of the Governor's actions in negotiating new gaming

---

[104] It appears that ICRC's argument here would only apply to MOA's breach of contract claim.

[105] Docket 12 at 15 (Mot.) (quoting *Hall v. Club Corp. of Am.*, 33 Fed. App'x 873, 876 (9th Cir. 2002)).

[106] *See* Ninth Cir. Fed. R. App. P. 36-3(c) (unpublished decisions dated prior to January 1, 2007 may not be cited, absent limited exceptions).

[107] *Makah Indian Tribe*, 910 F.2d at 558; *see also* 4 James Wm. Moore et al., *Moore's Fed. Practice* § 19.06 [4] (3d ed. 2005) ("There is no per se rule that parties to a contract are indispensible in cases in which the contract is in dispute. The court must apply a flexible analysis depending on the facts of each case. Generally, however, courts will find parties to a contract to be necessary in an action to set aside the contract.").

[108] 305 F.3d 1015 (9th Cir. 2002).

compacts with Indian tribes.[109]  The Ninth Circuit concluded that the Indian tribes, which had previously entered into contracts with the Governor, were necessary to the litigation pursuant to what is now Rule 19(a)(1)(B), because the tribes "claim[ed] an interest and [we]re so situated that th[e] litigation *as a practical matter* impair[ed] or impede[d] their ability to protect [that interest]."[110]  Notably, the Ninth Circuit did not conclude the tribes were necessary parties simply because they were parties to contracts with the Governor; rather, the Ninth Circuit evaluated how the litigation would affect the tribes' rights, past and future, under those contracts.  Regardless, *American Greyhound* is easily distinguishable because, in contrast to MarAd, the tribes there claimed an interest in the litigation.

ICRC also relies upon *McClendon v. United States*, which if read broadly, might support an argument that all parties to a contract are necessary parties.[111]  But that reading of *McClendon* would disregard the Ninth Circuit's precise and consistent holdings, dating back to 1975, that it is a "fundamental principle" that "a party to a contract is necessary, and if not susceptible to joinder, indispensable to litigation *seeking to decimate that contract*."[112]  Here, MOA does not seek to set aside the

---

[109]  *Id.* at 1018.

[110]  *Id.* at 1023 (emphasis in original).

[111]  885 F.2d 627, 633 (9th Cir. 1989) ("Because the Tribe is a party to the lease agreement sought to be enforced, it is an indispensable party under [Rule] 19.").

[112]  *Dawavendewa*, 276 F.3d at 1157 (2002) (emphasis added); *Northrop*, 705 F.2d at 1044 (1983) ("parties who may be affected by a suit to set aside a contract must be present," but this rule was not applicable to case because parties did not seek to set aside contract); *Lomayaktewa v. Hathaway*, 520 F.2d 1324, 1325 (9th Cir.1975) ("No procedural principle is more deeply imbedded in the common law than that, in an action to set aside a lease or a contract, all parties who may be affected by the determination of the action are indispensable.").

contracts between MarAd and ICRC, and ICRC has provided no compelling authority to support a conclusion that MarAd is a necessary party simply because it was a party to the contracts with ICRC.

For the foregoing reasons, the Court will deny ICRC's motion to dismiss pursuant to Rule 12(b)(7) for failure to name MarAd as a party in this litigation.

### III. ICRC's Motion to Dismiss Pursuant to Rule 12(b)(6): Third-Party Beneficiary.

ICRC asserts that MOA has not and cannot plead sufficient facts to demonstrate that it is a third-party beneficiary of the 2003 and 2008 Contracts. On this basis, ICRC asserts the Court must dismiss the breach of contract claim against ICRC (Count I).[113]

### A. Review of a Rule 12(b)(6) Motion to Dismiss.

Under Rule 12(b)(6), a party may move to dismiss a cause of action for failure to state a claim upon which relief can be granted. Pursuant to the Supreme Court's decision in *Ashcroft v. Iqbal*, to survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'"[114] This requires "more than a sheer possibility" of entitlement to relief, though it need not rise to the level of probability.[115] "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."[116] Making such a determination is "a

---

[113] Docket 12 at 24 (Mot.).

[114] 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

[115] *Id.*

[116] *Iqbal*, 556 U.S. at 679.

context-specific task that requires the . . . court to draw on its judicial experience and common sense."[117]

## B. Discussion.

In the briefing, ICRC and MOA each evaluate the motion to dismiss for failure to state a claim under both federal and Alaska law, but neither directly addresses whether federal or Alaska law should apply.[118] The 2003 Contract incorporates various Federal Acquisition Regulation ("FAR") contract clauses, including FAR 52.233-1, which provides that the 2003 Contract is governed by the Contract Disputes Act (i.e., federal law).[119]

Under federal law, only a party to a contract or an intended third-party beneficiary may sue to enforce the terms of that contract or to obtain a remedy for its breach.[120] "To prove intended beneficiary status, 'the third party must show that the contract reflects the express or implied intention of the parties to the contract to benefit the third

---

[117] *Id.* at 679 (citation omitted).

[118] *See* Docket 12 at 24-30 (Mot.); Docket 37 at 41-47(Opp'n).

[119] *See* Docket 2-8 at 14 (2003 Contract). The 2008 Contract incorporates numerous FAR clauses, but does not appear to include FAR 52.233-1. However, the Court need not resolve whether FAR 52.233-1 applies to the later contract because, even if Alaska law applied, the result on this motion would be the same. "The Alaska Supreme Court 'will recognize a third-party right to enforce a contract upon a showing that the parties to the contract intended that at least one purpose of the contract was to benefit the third party.'" *Green v. Allstate Ins. Co.*, 885 F. Supp. 2d 959, 963 (D. Alaska 2012) (quoting *Ennen v. Integon Indem. Corp.*, 268 P.3d 277, 283 (Alaska 2012)).

[120] *GECCMC 2005-C1 Plummer St. Office Ltd. P'ship. v. JPMorgan Chase Bank, Nat'l Assoc.*, 671 F.3d 1027, 1033 (9th Cir. 2012).

party.'"[121]   Contracts with the government are subject to additional restrictions.   The

Ninth Circuit recently explained:

> Parties that benefit from a government contract are generally assumed to
> be incidental beneficiaries, rather than intended beneficiaries, and so may
> not enforce the contract absent a clear intent to the contrary.  This clear
> intent hurdle is a high one.  It is not satisfied by a contract's recitation of
> interested constituencies, vague, hortatory pronouncements, statements
> of purpose, explicit reference to a third party, or even a showing that the
> contract operates to the third parties' benefit and was entered into with
> them in mind.  Rather, [a court] examine[s] the precise language of the
> contract for a clear intent to rebut the presumption that the third parties are
> merely incidental beneficiaries.[122]

Thus, for MOA to demonstrate that it is the intended beneficiary of a government

contract, it must show not only that MarAd and ICRC intended the Contracts to benefit

MOA, but also that the language of the Contracts demonstrates a "clear intent to rebut

the presumption" that MOA was a merely incidental beneficiary.  Although MOA was not

a signatory to either the 2003 or 2008 Contracts between MarAd and ICRC, MOA has

pled sufficient facts, in conjunction with the language of the Contracts, to survive this

motion to dismiss.[123]

The Statement of Work, incorporated into the 2003 Contract, rebuts the

presumption, for purposes of this motion to dismiss, that MOA was merely an incidental

---

[121]  *GECCMC*, 671 F.3d at 1033 (quoting *Klamath Water Users Prot. Assoc. v. Patterson*, 204 F.3d 1206, 1211 (9th Cir. 1999)).

[122]  *GECCMC*, 671 F.3d at 1033-34 (internal citations, quotations, and alterations omitted); *see also Smith v. Central Arizona Water Conservation Dist.*, 418 F.3d 1028, 1035 (9th Cir. 2005).

[123]  On this motion to dismiss, the Court may consider the 2003 and 2008 Contracts, which were incorporated by reference into the Complaint.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322 (2007).

beneficiary to the contract.[124]    The Statement of Work broadly describes the

"Background" for the Project: "The Port of Anchorage (Port) is planning a variety of

expansion activities to enhance the transportation of goods and people within the State

of Alaska," and that this expansion will occur "through multiple projects."[125]    The

Statement of Work then explains the contract's "objective": "To meet this challenge [i.e.,

the Port's challenge to expand], the Contract [i.e., the 2003 Contract] requires both

program management and technical assistance and support [i.e., which would be

provided by ICRC] for the duration of the expansion process."[126]    The Statement of

Work further provides:

> [ICRC] will conduct appropriate meetings with the Port staff . . . and
> potential future and commercial and military users of the Port . . . to
> understand their needs and requirements.  Those needs and requirements
> will be used to revise the Port's Master Plan, and to develop Port
> operational concepts, intermodal facility concepts, and pier/wharf/terminal
> concepts.   These concepts will be integrated into overall expansion
> program alternatives and carried forward into the environmental
> documentation and permitting process.[127]

For purposes of the motion to dismiss, the Statement of Work demonstrates that the

2003 Contract was intended to benefit MOA.  Whether it demonstrates a "clear intent to

rebut the presumption" that MOA was an incidental beneficiary is a closer question.

---

[124]  Several Ninth Circuit cases cite to *Smith*, 418 F.3d at 1037, for the proposition that a
statement of purpose is insufficient to rebut the presumption that a plaintiff is an incidental
beneficiary.  However, in *Smith*, the district and appellate courts reviewed and evaluated the
statement of purpose in the contract, and found it not compelling because it included only a
"horatory statement of purpose."  That is, the *Smith* court did not reject the statement of purpose
because it was not an actual term of the contract, but because it was unpersuasive.  This is
easily distinguishable from the specific and detailed Statement of Work in the 2003 Contract.

[125]  Docket 2-8 at 18 (2003 Contract, Statement of Work).

[126]  Docket 2-8 at 18 (2003 Contract, Statement of Work).

[127]  Docket 2-8 at 21 ¶ 4.3 (2003 Contract, Statement of Work).

However, the contract excerpts described above, in conjunction with MOA's allegations are sufficient. Most significantly, MOA pled that it is the "Project owner,"[128] thereby demonstrating a considerable greater interest in the Project than that of a merely incidental beneficiary.[129] In addition, MOA pled that it was "an intended third party beneficiary of the ICRC-MarAd Contract, as ICRC clearly intended to give [MOA] the benefit of ICRC's promised performance under the ICRC-MarAd Contract."[130]

With respect to the 2008 Contract, the Complaint alleges that it "formalized MOA's already recognized third-party beneficiary status under the MarAd-ICRC agreements.[131] The 2008 Contract unequivocally states:

> Upon acceptance by MARAD of work tendered under this Contract, all right, title and interest to such work shall convey to the Municipality of Anchorage and its Department Port of Anchorage as a third party beneficiary, unless otherwise provided. All warranties and guarantees provided by the Contractor shall benefit both MARAD and the Municipality of Anchorage and its Department Port of Anchorage.[132]

ICRC asserts that the 2008 Contract demonstrates that MarAd and ICRC knew how to designate a third party beneficiary, which they did not do in the 2003 Contract, and also that the third party beneficiary clause in the 2008 Contract was limited because MOA could not independently decline ICRC's work.[133] But neither of these arguments demonstrates that MarAd and ICRC did not intend for the 2003 or 2008 Contracts to

---

[128] Docket 2-2 at 10 ¶ 17 (Compl.).

[129] Docket 2-2 at 10 ¶ 17 (Compl.)

[130] Docket 2-2 at 47 ¶ 208 (Compl.).

[131] Docket 2-2 at 16-17 ¶ 40 (Compl.).

[132] Docket 2-2 at 16-17 ¶ 40 (Compl.) (quoting Docket 2-9 at 7 (2008 Contract)).

[133] Docket 12 at 28 (Mot.); Docket 75 at 13-14 (Transcript).

benefit MOA. Nor could these arguments refute the Court's conclusion that the allegations of the Complaint and terms of the contract, for purposes of this motion to dismiss, adequately rebut the presumption that MOA was an incidental beneficiary.

ICRC cites various cases, many involving water rights contracts, to support its argument that MOA was an incidental, rather than intended, beneficiary to the contracts between MarAd and ICRC.[134] For example, *Klamath Water Users Protective Association v. Patterson* concerned a relief water reclamation project in the Klamath Basin.[135] Irrigators in the basin challenged modification of a contract between the United States and a California power company, which had the right to operate a dam in the basin. The Ninth Circuit concluded that although the contract operated to the irrigators' benefit, there was no language of "clear intent" in the contract to make them third-party beneficiaries.[136] But *Klamath*, like the other water rights cases, is distinguishable from this case because there, the plaintiffs were members of the general public, while here, MOA is the owner of the Project.[137]

On this motion to dismiss, viewing the facts in the light most favorable to MOA, MOA's allegations combined with the terms of the Contracts demonstrate a "clear

---

[134] Docket 12 at 26-28 (Mot.).

[135] *Klamath*, 204 F.3d at 1211.

[136] *Klamath*, 204 F.3d at 1211.

[137] *See also Orff v. United States,* 358 F.3d 1137, 1145 (9th Cir. 2004) (contract did not demonstrate "clear intent" to benefit farmers, who sought to enforce water contract between United States and company overseeing water management project); *Smith*, 418 F.3d at 1035 (contract did not demonstrate "clear intent" to benefit landowners who sought declaratory relief related to water contract between conservation district and United States).

intent" to rebut the presumption that MOA was merely an incidental beneficiary.[138] Accordingly, ICRC's motion to dismiss on this basis will be denied.

## CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that ICRC's motion to dismiss at Docket 12 is **DENIED.** Defendants PND and VECO have already filed answers at Dockets 8 and 10. Defendant ICRC's answer is due within 14 days of this Order.[139]

DATED at Anchorage, Alaska this 4th day of March 2014.

/s/ *Sharon L. Gleason*
United States District Judge

---

[138] *See GECCMC*, 671 F.3d at 1033; *Smith*, 418 F.3d at 1035; *Klamath*, 204 F.3d at 1211.

[139] *See* Fed. R. Civ. P. 12(a)(4).